UNITED STATES of America, Appellee,

v.

Paul SUREFF and Michael Cardone, Defendants,

Maritza Metral, Defendant–Appellant.

No. 286, Docket 93–1279.

United States Court of Appeals, Second Circuit.

Argued Sept. 23, 1993.

Decided Jan. 13, 1994.

Michael T. Cornacchia, Assistant United States Attorney, Brooklyn, New York (Zachary Carter, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, of counsel), for appellee.

Edward P. Jenks, Mineola, New York, for defendant–appellant.

Before: MESKILL, KEARSE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

Maritza Metral appeals from her conviction by a jury before Judge Spatt on one count of conspiracy to distribute and possess with intent to distribute a substance containing cocaine.[1] *See* 21 U.S.C. §§ 841(b)(1)(C),

---

1. Metral, Michael Cardone, and Paul Sureff were arrested and indicted on one count of conspiring to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(b)(1)(C), 846 and twelve counts of using a communication facility in furtherance of illegal narcotics distribution and possession with intent to distribute in violation of 21 U.S.C. § 843(b), (c) (1988). The government agreed to sever Cardone's and Sureff's cases. Cardone pled guilty to a superseding information charging him with one of the counts under 21 U.S.C. § 843(b), (c). Sureff was found guilty of the conspiracy and five counts of use of a telephone to facilitate the conspiracy. At Metral's trial, the latter twelve counts were dismissed on her motion following the government's case.

846 (1988). Metral challenges her conviction on two grounds. First, she maintains that the government's evidence was insufficient to support her conviction. This challenge is based on the absence of direct, in contrast to circumstantial, evidence that Metral was dealing in cocaine. Second, she contends that the government's proof was of multiple conspiracies rather than the single conspiracy alleged in the indictment. We affirm.

1. *Sufficiency of the Evidence*

■ The evidence against Metral, which must be viewed in the light most favorable to the government, was entirely circumstantial. It consisted of: (i) taped telephone conversations using coded language; (ii) surveillance that disclosed suspicious activity consistent with cocaine dealing; and (iii) a false exculpatory statement by a coconspirator.

The evidence, which did not include a seizure of narcotics, an explicit reference to cocaine by Metral or a coconspirator, or direct testimony as to drug transactions, was as follows. The government began a seven-month investigation of Metral that involved telephone taps on her residence and on her real estate business, Raysun Enterprises, located in Queens. The pertinent telephone conversations involved discussions between Metral and Paul Sureff and Metral and Michael Cardone.

During the taped telephone conversations, Metral and the others discussed various items in disjointed and occasionally incomprehensible fashion. These items included "tickets," "the man," "real estate taxes," "cars," "houses," "papers," "licenses," "catering," "seafood platters," "the bank," "paperwork," "three-star meals," and "the rent." These terms were often connected with disputes over prices to third parties for the commodity under discussion.

The taped conversations reflected that the disputes had a potential for violence. For example, after complaining that "I can't put nothing together," Sureff confided to Metral, "That nigger motherfucker.... I'm gonna fucking put a cap through his head."

At Metral's trial, the government called FBI Special Agent Kent Paulin, a racketeering records examiner. Paulin had examined and opined on coded conversations in 250 cases and had been qualified as an expert in cryptanalysis 16 times previously in state and federal courts. Paulin testified that in his opinion the taped conversations concerned the distribution of cocaine. Specifically, Paulin testified that Metral and her coconspirators sought to sell two to three kilograms of cocaine for prices ranging from $23,000 to $27,500 per kilogram. He further testified that the "I can't put nothing together" conversation involved a frustrated drug transaction.

The government also called Robert Gates, a member of a joint state-federal Drug Enforcement Agency Task Force. Gates had nine years of experience in investigating cocaine trafficking and had participated in more than 300 investigations. Gates identified the various individuals on the tapes. He also testified as to the common methods of packaging of cocaine: zip-lock bags for eight ounces or less, brick-shape wrapped in tape or foil for a kilogram. Finally, he testified that he never heard cocaine traffickers refer to the narcotic by its name and that places where kilogram units of cocaine are stored and sold are sometimes referred to by traffickers as "the ranch, Hacienda, bank ... warehouse."

In support of its version of the coded conversations, the government provided the testimony of police officers who kept Metral and Cardone under surveillance. Their observations revealed inconsistencies between the ostensible subjects of the conversations and Metral's actions. In particular, in telephone conversations during the evening of February 25, 1990, and on the morning of February 26, 1990, Metral promised Cardone that she would call him about the "thing for the loan" as soon as she had spoken with "the bank." In a phone call in the evening of February 26, Metral informed Cardone that she had spoken with "the people in the bank," and that they would "do the thing" the next day. Surveillance during this period revealed that Metral had visited only three locations, none of them a financial institution, and that Metral had not placed a call to any financial institution. One of the loca-

tions she visited was a house at 164–18 65th Street in Queens.

Surveillance of the Raysun office and of Metral's and her common-law husband's comings and goings revealed conduct that was consistent with drug trafficking involving Cardone and others, although the conduct was quite ambiguous. Significantly, however, when Cardone was stopped by police in Brooklyn after being observed at, and followed from, the Raysun office, he told the officers that he was coming from the airport.

Surveillance of the house at 164–18 65th Street in Queens—to which Metral had traveled during the "bank" conversations—revealed conduct strongly suggesting that it was a locale for cocaine sales. In particular, persons were observed delivering brick-like objects wrapped in tinfoil to the house. Others leaving the house by car were observed making a quick turn the wrong way on a one-way street that prevented their being followed. Finally, a driver of a car that had stopped at the house was later observed examining a plastic bag with white powder in it.

▆▆▆ Metral bears a "heavy burden" in challenging her conviction on the ground of insufficiency. *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, *United States v. Nersesian,* 824 F.2d 1294, 1302 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987), but should the evidence, thus construed, suffice to convince any rational trier of fact beyond a reasonable doubt, then Metral's conviction must stand. *United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The government's case need not exclude "every possible hypothesis of innocence," *United States v. Friedman,* 998 F.2d 53, 59 (2d Cir.1993) (quoting *United States v. Soto,* 716 F.2d 989, 993 (2d Cir.1983)), and the jury's verdict may be based entirely on circumstantial evidence. *United States v.*

*Libera,* 989 F.2d 596, 601 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

Metral's insufficiency challenge, of course, focuses on the lack of any direct evidence—such as the seizure of cocaine or testimony of a coconspirator—of cocaine trafficking. However, crimes may be proven entirely by circumstantial evidence. It is thus established that a prosecution for murder may succeed without a body having been found or without evidence of the means of death being provided. *See People v. Scott,* 176 Cal. App.2d 458, 1 Cal.Rptr. 600 (1959), *appeal dismissed and cert. denied,* 364 U.S. 471, 81 S.Ct. 245, 5 L.Ed.2d 222 (1960); *Regina v. Onufrejczyk,* 1 All E.R. 247 (1955). So long as, from inferences reasonably drawn, the jury could fairly have found beyond a reasonable doubt that the defendant engaged in the charged criminal conduct, a conviction based on circumstantial evidence must be sustained. We are confident that the evidence in the present case meets that test.

First, Metral's phone conversations with Sureff and Cardone were deliberately confusing and sometimes unintelligible, indicating both that she did not want a listener to understand them and that she was fearful that her phones might be tapped. These apprehensions might reasonably be viewed by a trier as powerful evidence that the conversations involved trafficking in contraband. Moreover, the one thing clear on the face of the conversations is that they concerned the price to be derived from sales of the (contraband) commodity to be provided by Metral to Sureff and Cardone. For example, Metral and Cardone discussed the sale of a 1989 Honda Prelude for "24 or 25."

Second, there was persuasive evidence that the commodity in question was cocaine. Gates thus testified that at the time of the Honda Prelude conversation a kilogram of cocaine had a market value on Long Island of $23,000 to $27,000. The average retail price for a 1989 Prelude at that time was $11,000 to $11,500. Similarly, Paulin's detailed explanation of his versions of the conversations was entirely credible.[2] Moreover, drug traf-

---

2. We reject Metral's challenge to the admissibili-

ty of testimony as to the meaning of the defen-

ficking is often attended by violence, and the conversations indicate that one of the deals being discussed had a potential for violence.

Finally, the surveillance of the Raysun office, the Queens house, and Metral's movements added significant support to the government's case. Cardone's attempt to conceal his recent presence at the Raysun office was evidence of his consciousness of guilt concerning his activities there. Additionally, Metral's trip to the Queens house at the time of the "bank" conversations and the surveillance evidence that the house was a locale for cocaine trafficking were strongly supportive of the government's theory that the house was her cocaine "bank."

■ In the end, appellant's insufficiency argument is based on the view that circumstantial evidence is inherently weaker than direct evidence. That view is baseless, however. The entry into a house by a person wearing a wet raincoat and holding a wet, open umbrella may well be more reliable evidence of the climate than statements of a person inside the house looking out a window. Eyewitness identification is the most direct evidence of criminal conduct available yet many believe it to be more than occasionally unreliable. *See, e.g., Harper v. Kelly,* 916 F.2d 54 (2d Cir.1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1403, 113 L.Ed.2d 459 (1991); *Kanpshoff v. Smith,* 698 F.2d 581 (2d Cir.1983). Circumstantial evidence is thus not a disfavored form of proof.

Indeed, the record here is in some ways more compelling than that in many cases that come to this court. For example, this is arguably a stronger case than it would have been had there been no taped conversations but Sureff or Cardone, as part of a cooperation agreement with the government, had testified as to Metral's involvement. In such a case, the direct evidence would have been subject to the attack that the witness had a powerful incentive to lie and to tell the government what it wanted to hear, yet a convic-

tion based on such testimony would easily survive an insufficiency challenge. *See United States v. Simmons,* 923 F.2d 934, 953 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). At bottom, there is no reasonable and innocent explanation for Metral's conduct while there is a single, very plausible but criminal explanation: that she was dealing in cocaine. Viewing the evidence as a whole, therefore, *see United States v. Mariani,* 725 F.2d 862, 865–66 (2d Cir.1984), a rational fact-finder could reasonably convict Metral.

### 2. *Single versus Multiple Conspiracies*

■ Metral also contends that the evidence proved two separate conspiracies—one between her and Cardone, the other between her and Sureff—rather than the single conspiracy alleged in the indictment and that the evidence was therefore legally insufficient to support the jury's finding that a single conspiracy existed. Metral does not challenge the correctness of Judge Spatt's instruction to the jury on the issue of proof of single versus multiple conspiracies. Instead, she argues that no evidence directly links Sureff and Cardone and that no "rim" had been proved to turn the "spokes" of Sureff and Cardone into a "wheel" conspiracy. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Whether the government has proved a single or "multiple other independent conspiracies is a question of fact for a properly instructed jury." *United States v. Alessi,* 638 F.2d 466, 472 (2d Cir.1980) (citations omitted). To prove a single conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir. 1990) (quoting *United States v. Martino,* 664 F.2d 860, 876 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373

dants' coded language. Metral claims that Paulin's testimony improperly included conclusions as to the ultimate issue of Metral's guilt or innocence and thus invaded the province of the jury as sole trier of fact. We disagree. Agent Paulin testified only as to his interpretation of the coded exchanges between the conspirators. He did not testify as to their mental state, nor did he draw ultimate legal conclusions about their guilt. Expert testimony as to the meaning of coded conversations in narcotics transactions is clearly admissible. *See United States v. Boissoneault,* 926 F.2d 230, 232–33 (2d Cir.1991).

(1982)), *cert. denied*, —— U.S. ——, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991). Metral must, therefore, show that no rational trier of fact could have concluded that a single conspiracy existed based on the evidence presented. *United States v. Resto*, 824 F.2d 210, 212 (2d Cir.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

 Metral's challenge is meritless. A single conspiracy may encompass members who neither know one another's identities, *United States v. Labat*, 905 F.2d 18, 21 (2d Cir.1990) ("The defendant need not know the identities of all of the other conspirators, nor all of the details of the conspiracy."), nor specifically know of one another's involvement, *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947) ("[T]he law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all of its details or of the participation of others.").

Although the government introduced no evidence that Cardone and Sureff knew each other, they could

> be held to have agreed in a single conspiracy if each knew or *had reason to know* that other retailers were involved in a broad project for the importation, distribution, and retail sale of narcotics and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture.

*United States v. Barnes*, 604 F.2d 121, 155 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Both men had reason to know that in dealing with Metral they were involved with a larger organization, as evidenced by Metral's repeated references to speaking with or having spoken with "the bank" in her conversations with Cardone and to "the catering" in her conversations with Sureff. Each thus knew that Metral was an intermediary for the "bank"

and that their conduct was part of a large conspiracy with the "bank" at the center.

We therefore affirm.