**E.R. SQUIBB & SONS, INC., Plaintiff,**

v.

**ACCIDENT AND CASUALTY INSURANCE CO., et al., Defendants.**

82 Civ. 7327 (VLB).

United States District Court, S.D. New York.

May 20, 1994.

MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

I

This case involves controversies between E.R. Squibb & Sons ("Squibb"), a pharmaceutical manufacturer, and a number of its insurers in connection with product liability claims against Squibb arising out of injuries incurred by users of the product diethylstilbestrol ("DES"). By memorandum order dated April 21, 1992, *E.R. Squibb & Sons v. Accident & Cas. Ins. Co.*, 1992 WL 133899, 1992 US Dist. LEXIS 6255 (S.D.N.Y.1992) (the "1992 order"), I granted partial summary judgment in favor of Squibb concerning criteria for liability for defense costs.

The remaining parties defendant are all so-called "excess carriers," which by the terms of the policies they issued to Squibb, assumed responsibility in the situation where direct or primary insurance would be—or had been—exhausted.

The parties have now filed motions and cross-motions for partial summary judgment with respect to the remaining issues, which are those pertaining to excess carriers. Summary judgment is granted to the extent described below pursuant to Rule 56(d) of the Federal Rules of Civil Procedure:

(a) Applicability of the policies at issue in this case is triggered, in each instance in which there are ill effects of DES on users or on their children or grandchildren as a result of usage during pregnancy (1) by initial exposure to DES and (2) by each subsequent adverse development affecting those who have used DES or their children or grandchildren, including initial and ultimate manifestations or diagnoses of any ill consequences of such use.

(b) Under the language of the policies issued by each of the excess carriers, the excess carrier is liable when the underlying policy limits of the primary carrier or carriers covering the period of time involved is exhausted, whether by payment or by arm's length settlement with the insured.

(c) The settlements arrived at to date between plaintiff and the primary carriers were arrived at through arm's length settlement.

(d) Under the language of the excess carriers' policies, those carriers are obligated to follow the criteria for payment agreed upon in settlements between Squibb and the primary carrier or carriers whose policy limits have been exhausted.

(e) All relevant policy limits must be determined with respect to each excess carrier exclusively from the policy issued by the carrier or from supplemental documents signed on behalf of that carrier.

The motions of several defendants to dismiss the complaint on grounds of absence of a case or controversy are denied. All motions not otherwise disposed of are denied without prejudice. Issues concerning payment of defense costs were addressed in the 1992 order and are not treated here.

## II

■ The principal question presented by the parties concerns what events constitute injury under policy provisions triggering coverage upon "injury," "resultant ... injury," "bodily injury," or an "occurrence" or event causing any form of such injury. The complex medical evidence submitted by the parties is consistent on the one point critical here: harm begins as soon as DES is ingested by the user, but the effects of DES may depend on other independent events occurring thereafter and affecting the user or her children so that symptoms may appear at differing times or with differing severity. In some cases injury is evident at birth, in some symptoms may become progressively severe, and in some harm is never detected. In light of these facts and in view of the policy language as well as teachings of case law, injury from DES for purposes of triggering coverage under the policies at issue may occur upon ingestion and at each moment thereafter.

■ In *American Home Products Corp. v. Liberty Mutual Ins. Co.*, 748 F.2d 760 (2d Cir.1984) ("*AHP*"), affirming and modifying 565 F.Supp. 1485 (S.D.N.Y.1983), the Court of Appeals held that no preconceived limitations could be placed on language such as "injury" in a policy. Judge Kearse's opinion makes it clear that injury in fact rather than any single abstract criterion such as exclusively exposure to a product, can trigger coverage under the policy language involved and that no artificial requirements are to be added to the policy. Depending on the circumstances, injury may occur upon exposure to a harmful product or upon occurrence, manifestation or diagnosis of harmful consequences. *American Motorists Insurance Co. v. E.R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (Sup.Ct.1978).[1]

■ Predictability in interpretation of policy language is important to insureds and to the insurance industry. Moreover, the term "injury" is plain on its face—it involves any form of harm which befalls a person adversely affected by the product involved whether that person is the ingestor or her offspring. Hence no extrinsic evidence concerning meaning of the term need be considered. See *Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 127–28 & n. 37 (D.C.Cir. 1986).[2] The courts of New York, the law of which is applicable, have consistently upheld construction of contracts based on their plain meaning where all terms are clear and adequately set forth—even if only in a confirmatory memorandum of an agreement. *Intershoe, Inc. v. Bankers Trust Co.*, 77 N.Y.2d 517, 569 N.Y.S.2d 333, 571 N.E.2d 641 (1991). Insurance policies in particular are, indeed, traditionally construed on their face notwithstanding contentions of oral modification, absent some pattern of conduct creating an

---

1. In *Keene v. Insurance Co. of North America*, 667 F.2d 1034, *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) the District of Columbia Circuit permitted exposure alone to trigger applicability of insurance policies in an asbestos context; see also *Van Wyck Associates v. St. Paul Fire Ins. Co.*, 115 Misc.2d 447, 454 N.Y.S.2d 266 (Sup.Ct.Queens Co.1982); *Aetna Casualty & Surety Co. v. Abbott Laboratories*, 636 F.Supp. 546 (D.Conn.1986).

2. Use of extrinsic evidence concerning the meaning of the term "injury" and cognate terms, even if found appropriate, would in this instance generate confusion without providing any significant guidance. See Fed.R.Evid. 403.

estoppel as to the specific claim without regard to the language of the policy. See generally, e.g., *Parker v. Prudential Ins. Co.*, 900 F.2d 772, 778 nn. 7–8 (4th Cir.1990).

Insofar as the *AHP* rulings favor the insured, the New York rule of construction against the drafter supports my decision to follow *AHP* without resort to extrinsic evidence. *Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 489 N.E.2d 1283 (1985).

The reality of uneven outcomes and timing of noticed effects from DES ingestion is virtually irrefutable circumstantial evidence that injury in fact is an ongoing matter, not an instantaneous single event. See generally *United States v. Sureff*, 15 F.3d 225 (2d Cir.1994). To select a single moment as the sole time of injury would involve what Justice Holmes referred to as "delusive exactness." *Truax v. Corrigan*, 257 U.S. 312, 343, 42 S.Ct. 124, 133, 66 L.Ed. 254 (1921) (dissenting opinion). The entire mosaic of events must be considered in order to insure the accuracy of legal characterization given to the situation. Compare in another context, *Harris v. Forklift Systems*, — U.S. —, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Where one has had the misfortune to be exposed to DES and to suffer adverse consequences from it, either as an ingestor or as the offspring of an ingestor, any attempted "disaggregation"[3] of occurrences would be unrealistic.

An interpretation contrary to the plain meaning of the policy would run counter to the underlying objective of insurance from the viewpoint of both carriers and insureds. That objective is the spreading of risk. Holding a single unique moment to constitute injury would pyramid losses upon insurers who happened to insure the risk at that unique moment rather than spreading it among those who insured the risk during the entire pertinent period. In a high-loss case, this could endanger those carriers who insured at the unique moment; it could also potentially deny the full protection bargained for by the manufacturer for itself and indirectly for injured members of the public. There is no occasion here to stretch or distort the policy language to reach such a counterproductive interpretation. See Jones, "The Jurisprudence of Contracts," 44 U.Cinc.L.Rev. 43 (1975).

### III

■ Applicable policy language covers sums "which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury ... through adjudication or compromise...." or equivalent language.[4]

Absent collusive arrangements to defraud an excess carrier, not present here, a carrier which has issued a policy containing that language must pay amounts due the insured which are unpaid for any reason, including a compromise reached by a first-tier carrier through an arm's length settlement. To rule otherwise in the face of clear language to that effect would be contrary to the public interest: it would undermine the reliability of contracts, and it would discourage settlements. No case ruling otherwise involving such language has been cited.

The only substantial attack leveled against any settlements reached to date in this case is that they ran counter to defendants' contentions concerning events triggering coverage which I have rejected in part II of this memorandum order.

### IV

■ The policy limits applicable to each excess carrier which is a defendant in this case must be determined by the language of the policy contract as communicated to and accepted by both parties. Reduction of policy limits of primary insurers by arm's length settlement or unilateral action of the insurer would not, however, excuse the excess carrier

---

3. Tushnet, "Book Review," 82 Colum.L.Rev. 1531, 1536–39 (1982); see *Continental Ore. Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1414–15, 8 L.Ed.2d 777 (1962).

4. While it is not necessary to the decision here, most although not all policies also provide that in "the event of reduction or exhaustion of ... underlying insurances .." to "continue ... as underlying insurance."

from continuing to provide "underlying insurance."

■ Communications about the status of primary carrier coverage through brokers or otherwise which were not signed by the parties or reflected *verbatim* in the policy itself should be disregarded. Where one would expect an important term to be in writing and signed, a contrary position is implausible[5] and may be rejected absent additional evidence to support that contrary position. See *Consarc v. Marine Midland Bank*, 996 F.2d 568 (2d Cir.1993); *TIAA v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987).

The nature of the voluminous but inconclusive information about nonbinding communications with brokers and others provided in this case reinforces the applicability of this approach.

## V

■ Several carriers have moved to dismiss the case as to them on grounds of absence of a case or controversy under Article III of the Constitution. See generally *Bank of New York v. Northeast Bancorp*, 9 F.3d 1065 (2d Cir.1993). The moving carriers argue that the primary carriers' policy limits are so unlikely to be exhausted that the excess carriers will never be reached, thus removing any genuine controversy over the issues addressed here.

Statistical evidence which need not be set forth in detail here makes it clear that a significant portion of Squibb's DES exposure remains in the future, and that it is highly uncertain whether primary carriers' policies will cover it.[6] Further, the likelihood that primary carriers' policy limits will be exhausted is greatly increased if, as required

by the policy language as interpreted here and contrary to the moving carriers' position, policy limits of the primary carriers may be exhausted by settlement as well as payment.[7] Under the circumstances, declaratory relief to settle the legal relations between the parties is useful and appropriate. *Continental Casualty Co. v. Coastal Savings Bank*, 977 F.2d 734 (2d Cir.1992).

■ All excess carrier defendants have joined in the contest of the substantive issues in the case, which is at least obliquely contrary to the argument that they have no interest in the outcome. The complaint was filed in 1982; no motions challenging existence of a genuine controversy were filed until February 15, 1993, eleven years after the filing of this case and almost a year after the April 1992 order. While such delay would not create a genuine controversy were one absent, it is a significant indication that only an afterthought is involved. See generally *Robins Island Preservation Fund v. Southold Development Corp.*, 959 F.2d 409, 421–25 (2d Cir.), *cert. denied*, ── U.S. ──, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992).[8]

## VI

It is not possible on the current record to determine with specificity what monetary amounts, if any, are due or will become due from any of the defendants. The main legal principles which were in dispute having been declared, such remaining matters are best resolved by negotiation.

■ The parties are directed to discuss settlement of the case in light of the rulings now made, and also to consider agreeing upon the appointment of a single arbitrator chosen to resolve present and possible future

---

**5.** *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

**6.** Approximately one third of DES-related cases brought against Squibb since 1973 remain open and approximately 100 new cases are brought yearly—a number which may increase because several states are considering removing time bars to many potential claims.

**7.** Two carriers originally parties to this case are insolvent.

**8.** Were defendants to be successful in establishing an Article III defense first asserted after the 1992 order, they might properly be held liable for legal expenses incurred by the adversary due to such delay in raising the issue. See *Basso v. Utah Power & Light*, 495 F.2d 906, 911 (10th Cir.1974); *Page v. Wright*, 116 F.2d 449, 454–55 (7th Cir.1940), *cert. dismissed*, 312 U.S. 710, 61 S.Ct. 831, 85 L.Ed. 1142 (1941); *North American Foreign Trading Corp v. Zale Corp*, 83 F.R.D. 293, 297 (S.D.N.Y.1979).

disagreements. Should the parties fail to agree, the court will consider appointment of a special master at the expense of the litigants to make recommendations for any monetary payments which may be indicated.[9]

## VII

■ The parties have filed numerous documents including memoranda of law under seal pursuant to a protective order designed to insure confidentiality of information, disclosure of which would be harmful to the parties. The protective order has been treated as authorizing sealing of almost all items filed with the court, including in their entirety massive numbers of exhibits and memoranda of law. The latter consist primarily of legal argument rather than confidential factual information. The effect has been to burden the Clerk of this court with unnecessary sealed material and to deny ready access to information about the decisionmaking processes of the judiciary. This situation is unacceptable.

The chief arguments for confidentiality with respect to any of the documents in this case appears to be (a) that one carrier should not know the settlement posture of another lest plaintiff bargain against itself, a risk largely erased by the determinations made in this memorandum order, and (b) that plaintiffs in DES injury lawsuits may benefit adventitiously from the pendency of the current litigation by knowing the extent of Squibb's insurance coverage or by acquiring medical data known to one or more parties to the present case.

■ No sensitive commercial information or trade secrets of the type mentioned in Fed.R.Civ.P. 26(c)(7) are involved, although confidentiality of medical information dealing with identifiable individuals is an interest recognized under Fed.R.Civ.P. 26(c). See *Gottlieb v. County of Orange*, 151 F.R.D. 258 (S.D.N.Y.1993). Withholding other medical information known to a party might well lead to adverse inferences in the personal injury litigation. See generally *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir.1988); *Gray v. Great American Recreation Ass'n.*, 970 F.2d 1081, 1082 (2d Cir.1992). The 1993 amendments to Fed.R.Civ.P. 37(c)(1) provide that sanctions for failing to provide required discovery "may include informing the jury of the failure to make the disclosure." [10]

There is no obvious special reason for retaining secrecy which would apply to the amount of material that has been labelled confidential. See generally *In re Orion Pictures Corporation*, 21 F.3d 24 (2d Cir.1994). The private benefits and harms of disclosure of the material mentioned may well be evenly balanced, giving great weight to the interest of the public in knowing the nature of material utilized in litigation (as distinct from mere discovery material obtained in litigation but not so utilized). See *Levy v. Weksel*, 143 F.R.D. 54 (S.D.N.Y.1992).

Although the material at issue is that submitted by the parties for use in decision rather than retained by them as a result of discovery, and no interest in confidentiality on the level of that provided by trade secrecy (see Fed.R.Civ.P. 26(c)) is involved, it would be premature to adjudicate whether or not some of the sealed material should be unsealed without a full-scale adversary presentation on behalf of the opposing interests at stake. See *In re New York Times*, 828 F.2d 110 (2d Cir.1987); *In re CBS*, 828 F.2d 958 (2d Cir.1987); *Westmoreland v. CBS*, 752 F.2d 16, 22–23 (2d Cir.1984), *cert. denied*, 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 614 (1985); *In re NBC*, 635 F.2d 945, 949 (2d Cir.1980).

The parties are directed to file publicly available copies of all memoranda of law and Local Rule 3(g) statements, omitting only material which they can certify under Fed.

9. Clauses requiring resort to other insurance do not operate to deny initial recourse to a carrier because that carrier argues that another is responsible. See *ACandS, Inc. v. Aetna Casualty & Surety Co.*, 576 F.Supp. 936 (E.D.Pa.1983). Equitable apportionment of costs between carriers is appropriate and should be achieved by inter-carrier negotiation or use of a neutral agreed-upon umpire.

10. The First Judiciary Act § 15, 1 Stat. 82 (1789) provided granting of judgment in favor of the adversary as a sanction for failure to produce "books or writings."

R.Civ.P. 11 to contain genuinely confidential material. See *McGrane v. Reader's Digest,* 1993 WL 525127, 1993 U.S. Dist. LEXIS 17790 (S.D.N.Y.1993).[11]

There is nothing in the Federal Rules of Civil Procedure which requires the Clerk to retain bulky exhibits. The Appellate Rules are, indeed, explicit on the point. Fed. R.App.P. 11(b), ¶ 2. The Clerk is directed to return to the parties, and the parties are directed to maintain until final conclusion of this litigation, all exhibits filed under seal to date in this case. No additional material shall be filed under seal without further order.

SO ORDERED.

11. The publicly available versions of the documents involved shall be filed and docketed as new items to avoid confusion. The parties shall brief the propriety of retaining as confidential, medical information other than that relating to specific persons.