UNITED STATES of America, Appellee,

v.

John VALENTI, Defendant–Appellant.

No. 1510, Docket 94–1462.

United States Court of Appeals,
Second Circuit.

Argued May 12, 1995.

Decided July 6, 1995.

---

Michael M. Milner, Milner & Daniel, New York City (Emily R. Daniel, Michele Stolls, of counsel) for defendant-appellant.

Douglas R. Jensen, Asst. U.S. Atty., S.D.N.Y. (Mary Jo White, U.S. Atty., Alexandra Rebay, Asst. U.S. Atty., of counsel) for appellee.

Before: McLAUGHLIN, CABRANES, and PARKER, Circuit Judges.

McLAUGHLIN, Circuit Judge:

John Valenti was the treasurer of Caravanserai Owners Association (the "Association"). He was charged with interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2, in connection

with the embezzlement of Association funds. Valenti was convicted following a jury trial in the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., *Judge*). He was sentenced to 24 months' imprisonment, and was ordered to pay restitution of $122,466. Valenti appeals his conviction and sentence. For the reasons that follow, we affirm.

## BACKGROUND

From 1982 to 1992, John Valenti was the treasurer of the Association, an organization of approximately 40 United States residents who owned apartments in the Caravanserai Hotel on the Dutch part of the island of St. Maarten. The Association was managed by a Board of Directors elected by the members, and by two officers in addition to Valenti—a chairman and a secretary. Most significantly, the weight of evidence at trial suggested that none of the officers received any compensation. The chairman of the Association was Morris Shamos.

The Association had a checking account in its name at Chase Manhattan Bank in New York, where Valenti worked before he retired in 1990. Valenti kept the checkbook, and Chase mailed account statements to him. He had authority to issue checks on his own signature only up to $1,000. For larger amounts, the signature of a second officer of the Association was required.

In an indictment filed December 29, 1992, Valenti was charged with interstate transportation of stolen property, in violation of 18 U.S.C. §§ 2314 and 2, arising out of his embezzlement of Association funds. The time frame specified in the indictment was from April 1991 to May 1992.

*The embezzlement*

According to the government, in April 1991, Valenti began writing checks on the Association's account, payable either to himself or his wife, Martha Valenti, and depositing those checks in his own bank account in New Jersey. Between April 21, 1991 and May 8, 1992, Valenti wrote 65 checks totalling $63,466 to himself or his wife—each for an amount slightly under $1,000. He deposited 60 of those checks (more than $58,000) into the New Jersey account. The other checks were deposited into a personal account maintained by Valenti and his wife at Chase Manhattan Bank in New York.

On numerous occasions, Valenti wrote several checks to himself in a single day, each for an amount just under $1,000. In contrast, when Valenti wrote checks for the Association's expenses, he issued one check for the full amount, and, when the amount exceeded $1,000, he presented the check to Shamos for the requisite co-signature. None of the checks written by Valenti to himself was reflected in his annual report to the members of the Association for 1991.

Valenti's fraud came to light in May 1992, when a $20,000 check drawn on the Association's account was returned for insufficient funds. To explain the bounced check, Valenti told Shamos that it had been returned because the bank had erroneously made certain wire transfers out of the Association's account. Valenti assured Shamos that he would have the error corrected. After several weeks of foot-dragging by Valenti, Shamos became suspicious. Shamos himself contacted Chase on June 12, 1992 and learned that there had been no wire transfers out of the Association's account during the period of the alleged bank error. Shamos also obtained photocopies of several of the checks Valenti had written to his wife.

The next morning, June 13, 1992, happened to be the date of the annual meeting of the Association. Valenti announced to Shamos, the board, and the membership that he had written the checks to his wife to reimburse himself for paying the premium for the Association's insurance policy in St. Maarten out of his own pocket. This was a lie, as Valenti had not paid the premium at all. Suspiciously, although at every annual meeting before 1992 Valenti furnished a financial report setting forth the Association's financial status and the balance in the Chase account, he did not provide such a report at the June 1992 meeting.

*The defense case*

Valenti's defense was that Shamos had agreed to pay him $2,000 per month for certain "consulting work" performed for the

Association, and that the contested funds were actually legitimate payments owed to him. He called three witnesses.

Lucia Trifan, employed by Valenti as the supervisor of a St. Maarten apartment building apparently unconnected to the Caravanserai Hotel, testified that she attended a meeting with Valenti, Shamos and Shamos' wife in February 1990 at the Caravanserai Hotel, during which she overheard Shamos and Valenti talking "about $2,000 for salary monthly for Mr. John Valenti."

Martha Valenti, defendant's wife, recalled that, in early 1990, Valenti received a telephone call from Shamos, during which she overheard Valenti say "something about receiving a salary for or being reimbursed for—being reimbursed for expenses and also for something about his time, he was going to be paid for his time." Martha Valenti also stated that she "heard something about $2,000 per month." She further testified that in June 1991 she overheard Valenti's side of another telephone conversation with Shamos, in which Valenti said he expected "his salary to continue" but "since he was going to be spending considerably more time on the island [of St. Maarten] that the expenses would no longer need to be reimbursed."

Finally, Laura Rose, who ran a restaurant on St. Maarten, testified that she once overheard a snippet of a conversation between Valenti and Shamos at her restaurant in February 1990. She recalled that Shamos asked Valenti if the $2,000 included expenses, that Valenti said "I think it should," and that Shamos said "Oh, OK."

In rebuttal, the government re-called Shamos and asked if he ever had any conversation with Valenti about payment of compensation by the Association. Shamos answered, "None whatever." The district judge then questioned Shamos about the specific occasions mentioned by the defense witnesses where Shamos and Valenti allegedly discussed compensation. Shamos testified that the conversations never took place.

Valenti moved for a judgment of acquittal under Fed.R.Crim.P. 29 on the ground that the government failed to prove that he trans-ported the checks knowing that they were stolen. (He had made a similar motion at the close of the government's direct case.) The district court denied the motion.

The jury convicted Valenti. At sentencing, the district court calculated a base offense level of four under U.S.S.G. § 2B1.1(a). Nine levels were added pursuant to § 2B1.1(b)(1) because the loss totalled $122,466. That figure included $59,000 from seven wire transfers predating the time frame specified in the indictment, plus $63,466 from the period covered by the indictment. Two points were added for abuse of a position of trust under § 3B1.3, and two additional points were added for more than minimal planning, § 2B1.1(b)(5). These calculations yielded a total offense level of 17. With a Criminal History Category I, the sentencing range was 24 to 30 months. The district court sentenced Valenti to 24 months' imprisonment, and ordered restitution of $122,466. Valenti now appeals.

## DISCUSSION

### I. Pre-trial motion to exclude evidence

Before trial, Valenti was contemplating a defense that some of the funds he took from April 1991 to May 1992 were to repay himself for a $24,000 "loan" he had made to the Association in 1990. The government indicated that, if he pursued this defense, it would introduce evidence of seven wire transfers Valenti made from the Association's account to his wife, his mother, and his business partner in 1989 and 1990, all of which predated the purported loan. The government proffered this evidence to show that, while he had indeed put $24,000 into the Association's account, it was hardly a loan to the Association, but rather an attempt to return some of the money Valenti had stolen through the wire transfers.

Valenti moved *in limine* to preclude the government from offering, under any circumstances (and regardless of whether he testified), evidence of the seven wire transfers. The district judge declined to rule prior to trial, stating that he was "going to see how the evidence is portrayed by counsel for the defendant and the prosecution and make my

ruling at the time it becomes germane." Valenti never attempted to prove the loan; and the government never offered evidence of the seven wire transfers.

■ Valenti now contends that it was reversible error to leave open the possibility that the government might be allowed to introduce the evidence. His argument appears to run as follows: if he were to testify, the issue whether the funds he took from April 1991 to May 1992 were in repayment of the alleged $24,000 loan would "inevitabl[y] . . . have been raised." Once the issue was "raised," Valenti faced the possibility that the government would be permitted to introduce evidence of the seven wire transfers. Since Valenti could not run that risk, he was effectively precluded from testifying. This argument is meritless.

In the first place, Valenti's briefs and appendix contain no indication that he renewed at trial his request for a ruling, a step clearly required when the trial judge had earlier stated that he would reserve judgment until he heard the trial evidence. The failure to renew the objection constituted a waiver of the objection. *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence,* § 12 (2d ed. 1994); *United States v. Miles,* 889 F.2d 382, 384 (2d Cir.1989) (defendant's failure to renew objection at trial constituted waiver of objection where court instructed counsel that pre-trial ruling was "for present purposes only").

In the second place, one of the risks any criminal defendant must run is the "difficult choice on whether the value of his anticipated evidence would outweigh whatever damaging rebuttal evidence the government might produce." *United States v. Delia,* 944 F.2d 1010, 1018 (2d Cir.1991).

■ Finally, we are in no position to evaluate the alleged damage to defendant's case, since his decision not to take the stand makes this impossible. *See Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (defendant's election not to testify prevents appellate review of district court's decision to allow evidence of defendant's criminal record for impeachment purposes under Fed.R.Evid. 609(a)); *United States v.*

*Johnson,* 767 F.2d 1259, 1270 (8th Cir.1985) (applying *Luce* to Fed.R.Evid. 404).

■ Valenti also claims that the government failed to provide "reasonable notice in advance of trial" of evidence of the wire transfers, as required by Fed.R.Evid. 404(b). The government furnished records of the transfers only four days before trial. Assuming (as Valenti does) that Rule 404(b) controls, we hold that the government provided reasonable notice by giving the documents to him the very day it obtained them. It is not without significance that Valenti failed to seek a continuance or other postponement to study the documents.

## II. *Sufficiency*

■ Valenti argues that the district court erred in denying his motion for a judgment of acquittal under Fed.R.Crim.P. 29. He asserts that there was insufficient evidence that he transported the checks "knowing" that they were stolen, as required by 18 U.S.C. § 2314. In a sophism worthy of Protagoras himself, he posits that he could not *"know"* the checks were stolen because as a matter of law they were *not* stolen. And this is so because he alone was empowered to determine whether a payment under $1,000 should be issued. Having determined that it was proper to issue himself 65 such checks for his own personal use, his argument runs, he had a good faith belief that the payments were legitimate.

■ In a sufficiency challenge, "the evidence [must] be viewed in the light most favorable to the government and all permissible inferences drawn in its favor." *United States v. Sureff,* 15 F.3d 225, 228 (2d Cir. 1994). "[S]hould the evidence, thus construed, suffice to convince any rational trier of fact beyond a reasonable doubt, then [the] conviction must stand." *Id.* The verdict may be based entirely on circumstantial evidence. *Id.* at 228–29.

Viewed in this light, the evidence that the checks were stolen and that Valenti knew it was more than sufficient. Shamos testified that Valenti was authorized to issue checks only for amounts less than $1,000, that Valenti was required to obtain a co-signature

for greater amounts, and that no officer of the Association received compensation for his duties. Shamos further testified that none of the checks Valenti wrote was for an authorized purpose, and denied ever telling Valenti that he could write checks to himself, anytime he wanted and for any purpose he chose.

Additionally, the government offered the following circumstantial evidence that Valenti knew that what he was doing was wrong: Valenti wrote each of the checks to himself or his wife in an amount just under $1,000; he often wrote several such checks in a single day, rather than one large check (for which a co-signature would be required); he created false documents, such as the annual statement of expenses for 1991; he lied about unauthorized wire transfers from the Association's account; and he falsely claimed that he wrote the checks to reimburse himself for insurance premiums he claimed to have paid out of his own funds. From this evidence, both direct and circumstantial, the jury could readily conclude that Valenti knew he could not write checks for his personal use and that the checks were therefore stolen.

## III.  *Tax returns*

■ Valenti argues that the district court should not have admitted his tax returns for 1991 and 1992 because, under Fed.R.Evid. 403, the probative value of the returns was substantially outweighed by the danger of unfair prejudice from the "obvious inference" that he was a tax cheat. This Court reviews for abuse of discretion. *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir.1992).

The government offered the tax returns, which did not list as income any of the money Valenti took from the Association, to rebut Valenti's defense that the money was legitimate compensation. The tax returns were obviously probative to refute Valenti's defense that the contested funds were legitimate compensation for work he performed for the Association. As the district court observed, "by taking the money and not declaring it on his income tax it implies rather strongly that the conversation he alleges took place with Mr. Shamos didn't exist." Any arguable prejudice to Valenti was *de minim-*

*is:* it strains credulity to think that the jury might have believed Valenti innocent of transporting stolen goods, but voted to convict him anyway just because he failed to report income on his tax returns.

Valenti also argues, for the first time, that there was an innocent explanation for his failure to report as income the funds he took: the money was earned off-shore in St. Maarten, and thus was not subject to United States tax. We decline to address this argument, which Valenti did not raise below, although he had ample opportunity to do so. *See, e.g., Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir.1995) ("As a general rule, appellate courts do not consider issues that were not raised at the district court.").

## IV.  *District judge's questioning*

■ The district judge questioned Shamos at trial. Valenti argues that the questioning "bolster[ed] the credibility of the Government's principal witness" and "call[ed] into question the credibility of the defendant's witnesses," thereby denying him a fair trial. On review, we must "examine the entire record and attempt to determine whether the conduct of the trial has been such that the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir.1967), *cert. denied*, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970).

In its rebuttal case, the government asked Shamos a general question about whether he had any discussions with Valenti concerning compensation from the Association. Shamos replied: "None whatever." The prosecutor also asked whether Shamos had authorized any of the checks as compensation to Valenti. Shamos answered: "No, none were authorized." The district judge then questioned Shamos about the specific times and places at which the defense witnesses suggested that Shamos and Valenti had discussed compensation. For example:

Q:  In June of 1991, did you have a telephone conversation with Mr. Valenti in which he asked you, or rather in which he told you that he would no longer require to be reimbursed for

expenses but expected his monthly pay to continue?

A: No such conversation ever took place.

Q: Was the subject of $2,000 a month raised with you in your condominium?

A: No, it was not.

In denying Valenti's motion for a mistrial based on the court's conduct, the district court characterized its questioning as "in the nature of cross-examination." The transcript is at least as consistent with that characterization as it is with Valenti's characterization. The court conducted a fact-specific inquiry into Shamos' general statement that he never discussed any compensation arrangement with Valenti. In addition, before deliberations, the court took the wise precaution of instructing the jury to "draw no inference from the fact that upon occasion I asked questions of certain witnesses" and that "the court has no opinion as to the verdict you should render in this case." Accordingly, the record does not support the inference that "the judge's behavior was so prejudicial that it denied [defendant] a fair, as opposed to a perfect, trial." *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985).

## V. *Sentence*

■ Valenti contests the two-level enhancement in his sentence for abuse of a position of trust. His argument lacks merit.

Application note 1 to U.S.S.G. § 3B1.3 explains that the enhancement for abuse of trust applies to "a position of public or private trust characterized by professional or managerial discretion." The application note further states that

> For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, [or] a bank executive's fraudulent loan scheme.... This adjustment would not apply in the case of an embezzlement or theft by an

ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Valenti argues that his role was similar to that of a bank teller. We disagree. Valenti was treasurer of the Association. He had authority to issue checks on his own signature under $1,000. He was responsible for the financial records. He had sole possession of the checkbook. His position, therefore, bore little resemblance to "the tight accounting controls that restrict a bank teller." *United States v. Melendez*, 41 F.3d 797, 799 (2d Cir.1994).

■ Valenti also argues that the loss calculation failed to take into account the $24,-000 he deposited in the Association's account. He asserts that the first $24,000 he took from the Association's account during the period specified in the indictment was simply a return of the $24,000 he had earlier deposited as a "loan" to the Association in 1990. If the $24,000 had been excluded, Valenti's offense level would only have been increased by eight under § 2B1.1(b)(1), rather than nine.

Unfortunately for Valenti, the undisputed evidence presented to the district court at sentencing revealed that before he deposited the $24,000 in October 1990, he had already transferred a total of $59,000 to his mother, wife, or business partner. Thus, the court was entitled to conclude that the $24,000 deposit was hardly a loan to the Association, but, rather, a partial repayment of previously stolen funds. As such, it was properly included in the calculation. *See, e.g., United States v. Brach*, 942 F.2d 141, 143 (2d Cir. 1991) (definition of loss includes property subsequently returned).

## CONCLUSION

We have considered all of defendants' remaining arguments, and find them to be without merit. The judgment of conviction and sentence are AFFIRMED.