101 F.3d 684
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee,
v.
Eric ADAMS, Defendant-Appellant.
 No. 95-1651.
 United States Court of Appeals, Second Circuit.
 May 15, 1996.
 
 1
 APPEARING FOR APPELLANT: Susan G. Kellman, New York, N.Y.
 
 
 2
 APPEARING FOR APPELLEE: David C. James, Assistant United States Attorney, Eastern District of New York, Brooklyn, N.Y.
 
 
 3
 E.D.N.Y.
 
 
 4
 AFFIRMED.
 
 
 5
 This cause came on to be heard on the transcript of record from the United States District Court for the Eastern District of New York and was argued by counsel.
 
 
 6
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the decision of the district court is AFFIRMED.
 
 
 7
 Defendant Eric Adams appeals from a judgment of the United States District Court for the Eastern District of New York (Reena Raggi, Judge ), following his conviction by a jury on each count of a fifteen-count superseding indictment charging him, inter alia, with (1) racketeering and racketeering conspiracy, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and 1962(d); (2) robbery and robbery conspiracy affecting interstate commerce in violation of the Hobbs Act, 18 U.S.C. § 1951; and (3) using and carrying firearms in connection with crimes of violence, in violation of 18 U.S.C. § 924(c). Adams was sentenced principally to two concurrent terms of life imprisonment plus consecutive terms totalling sixty-five years. On appeal, Adams challenges the sufficiency of the evidence on his RICO convictions for racketeering and racketeering conspiracy. Adams contends that the government failed to prove (1) the existence of an "enterprise" under RICO; (2) that the alleged enterprise affected interstate commerce; and (3) the existence of a "pattern of racketeering activity" under RICO or the defendant's participation in the alleged enterprise.
 
 
 8
 In reviewing a defendant's challenge to a conviction on sufficiency of the evidence grounds, we view the evidence in the light most favorable to the government and draw all permissible inferences in its favor. United States v. Sureff, 15 F.3d 225, 228 (2d Cir.1994). The judgment of conviction must be upheld if "any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." United States v. Taylor, 18 F.3d 55, 58 (2d Cir.), cert. denied, 114 S.Ct. 2720 (1994) (emphasis in original) (quotation marks omitted).
 
 
 9
 According to the government, Adams, together with his alleged co-conspirators Alton McMillan, Timothy Haywood, Arthur Mack, "Rubio," "Miguel," and others, joined together to plan and execute a series of violent commercial robberies of small businesses in New York City--one of which resulted in murder--between July 1993 and April 1994. The government's cooperating witnesses included McMillan and Haywood, who provided the following information about the group's activities:
 
 
 10
 1. In the summer of 1993, McMillan was introduced to "Rubio" and "Miguel," who suggested that McMillan join them in a robbery of a lower Manhattan wholesale cigarette and candy business, C.S. Wholesale, that was known to have large amounts of cash on the premises. C.S. Wholesale purchased its candy supply from New Jersey. McMillan was informed by Miguel and Rubio that the owner of the store would make a significant deposit at 7 P.M. on July 3, 1993, and on that day, McMillan joined by his friend, Arthur Mack, Miguel, and another man, robbed owner Ralph Quiros of $18,000. The proceeds were divided among the participants.
 
 
 11
 2. Soon afterwards, Miguel and Rubio contacted McMillan with information about a second robbery target, a Brooklyn "numbers operation." McMillan and Mack recruited the defendant, Adams, who in turn recruited his brother-in-law, Haywood, for the robbery. McMillan, Adams, and Haywood first conducted surveillance, and then several weeks later, McMillan, Adams, Haywood, Miguel, and a friend of Miguel's, Jose Guitierrez, robbed the "numbers operation" of $12,000. The participants divided the proceeds.
 
 
 12
 3. While McMillan was in jail on charges stemming from another robbery, Rubio contacted Adams about another robbery. On October 16, 1993, Adams and Haywood robbed the owners of C.S. Wholesale at gunpoint of $10,000 in cash, shooting two bystanders while fleeing the scene.
 
 
 13
 4. In November 1993, Rubio gave McMillan information about a Brooklyn-based poultry business, Mariani Brothers Poultry, whose employees carried large sums of cash from the store. The chickens and turkeys sold by Mariani Brothers were purchased in Massachusetts and Pennsylvania. On December 4, 1993, with McMillan, Adams, Rubio and another person first conducting surveillance, Adams robbed Mariani's courier of $3000 at gunpoint while McMillan drove the "getaway" car. McMillan and Adams divided the money, and McMillan gave a portion of his share to Rubio.
 
 
 14
 5. In December 1993, Adams contacted McMillan about robbing Show World, a video and pornography arcade in Manhattan. It appears undisputed that Show World purchased some of its videos from out of state. On December 27, 1993, McMillan drove Adams to the arcade where Adams, armed with a silver nine-millimeter revolver, robbed the store of $112. While fleeing the scene, Adams shot and killed a bystander. McMillan and Adams later divided the proceeds of the robbery.
 
 
 15
 6. In February 1994, Rubio and Miguel contacted McMillan about a Queens jewelry store owner who kept large amounts of cash in his home. On February 23, 1994, Miguel, McMillan, and Adams drove to the home, and subdued the owner and his maid at gunpoint. No cash was found in the home.
 
 
 16
 7. The last robbery occurred on April 14, 1994, when Adams and McMillan decided to rob the Flushing Fruit Plaza ("Flushing"), a Brooklyn fruit store. There is no dispute that Flushing purchased products from out of state. Adams and McMillan followed one of the store's employees from the bank to store, where Adams robbed the employee. While attempting to escape, McMillan and Adams were subdued and arrested.
 
 
 17
 At the close of the government's case, Adams moved pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure to dismiss the counts relating to the Show World and Flushing robberies, arguing that they were unrelated to the alleged enterprise because they were conducted without the benefit of information supplied by Rubio and Miguel. Denying the motion, the district court held:
 
 
 18
 [Viewed] in the light most favorable to the government, I do think [the proof] could show that there was an ongoing agreement between Mr. Haywood, Mr. McMillan and Mr. Adams, particularly the latter two, to commit robberies whenever the opportunity presented itself, and when they were equipped to do so, whether it was because they got tips from other people, or whether because they saw opportunities themselves....
 
 
 19
 We agree and we affirm the judgment of the district court.
 
 
 20
 First, there was sufficient evidence for the jury to find the existence of a RICO enterprise. An "enterprise" is defined by 18 U.S.C. § 1961(4) as "any ... group of individuals associated in fact although not a legal entity." The Supreme Court has held that an enterprise is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981); see also United States v. Coonan, 938 F.2d 1553, 1559 (2d Cir.1991) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.' ") (emphasis in original), cert. denied, 503 U.S. 941 (1992). Viewing the evidence in the light most favorable to the government, we find that the government offered sufficient proof of the existence of an enterprise: (1) The alleged conspirators cooperated towards a single, distinct purpose--making money by robbing businesses; (2) The evidence supported the inference that there was an ongoing informal organization, lead by Adams and McMillan and joined by Haywood and others, that robbed businesses either based on tips from others (Rubio and Miguel) or on their own initiative; and (3) Based on the evidence, a reasonable jury could have concluded that Adams and McMillan, accompanied by various others on different occasions, were the core personnel who functioned as a continuing unit to form the enterprise.
 
 
 21
 Similarly, the government offered sufficient evidence on the interstate commerce element of RICO.[1] We find it curious that Adams argues that there was insufficient proof of the enterprise's effect on interstate commerce, while he leaves unchallenged his four convictions for affecting interstate commerce through robbery in violation of the Hobbs Act, which served as the predicate acts for the RICO convictions. We have previously held that the interstate commerce element of the Hobbs Act may be satisfied under the so-called "depletion-of-assets" theory where the defendant's illegal acts deplete his victims' assets, thereby affecting the victims ability to purchase commodities that travel in interstate commerce. See United States v. Jones, 30 F.3d 276, 285 (2d Cir.1994) (applying "depletion-of-assets" theory to satisfy interstate commerce element of Hobbs Act where defendant robbed federal agent who sought to purchase cocaine traveling in interstate commerce); United States v. Calder, 641 F.2d 76, 78 (2d Cir.) (same where defendant extorted $15,000 from bars that engaged in interstate purchases of food and liquor), cert. denied, 451 U.S. 912 (1981). The government offered sufficient evidence that the alleged enterprise concerned the robberies of various businesses and that those businesses engaged in interstate commerce.
 
 
 22
 Finally, we find sufficient evidence in the record to support the jury's finding of a "pattern" of racketeering activity. "Racketeering" includes violations of the Hobbs Act, as well as robbery and murder in violation of state law. 18 U.S.C. § 1961(1). We have previously held that, in order to satisfy RICO's pattern requirement, the government must establish that two racketeering acts were related to each other and that they resulted in, or posed a threat of, continuing criminal activity. United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir.) (in banc ), cert. denied, 491 U.S. 907 (1989). Here, the predicate acts--the robberies--were plainly related to one another as well as to the enterprise's common purpose of making money by robbing commercial businesses with large amounts of cash on hand. The crime spree included seven robberies over an eight-month period and clearly it supported an inference of a threat of continuity.
 
 
 23
 We have considered all of the defendant's other arguments and we find them to be without merit.
 
 
 24
 The judgment of the district court is affirmed.
 
 
 
 [1]
 18 U.S.C. § 1962(c) provides in relevant part:
 It shall be unlawful for any person employed by or associated with any enterprise ..., the activities of which affect interstate or foreign commerce, to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity....
 (emphasis added).