UNITED STATES of America, Appellee,

v.

Gary Stephen WEST, Appellant.

No. 94–3094.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 7, 1995.

Decided June 9, 1995.

A.J. Kramer, Federal Public Defender, Washington, DC, argued the cause and filed the briefs, for appellant.

Barbara A. Grewe, Asst. U.S. Atty., Washington, DC, argued the cause, for appellee. With her on the brief were Eric H. Holder, Jr., U.S. Atty., John R. Fisher, Elizabeth Trosman and David H. Baum, Asst. U.S. Attys., Washington, DC.

Before: EDWARDS, Chief Judge, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge WALD.

HARRY T. EDWARDS, Chief Judge:

Appellant Gary S. West challenges the District Court's two-point upward adjustment of his sentence, pursuant to section 3B1.3 of the federal Sentencing Guidelines ("Guidelines"), for allegedly abusing a position of private trust. West pleaded guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344, in the United States District Court for the District of Columbia. West, the president and sole employee of a small courier company, admitted culpability for two fraudulent schemes, one involving the theft of checks he had been hired to transport, the other involving certain false credit card transactions. West engaged in his first scheme while employed through contract as a courier, and his duties were simply to trans-

port certain checks from one local bank branch to another. In carrying out his second scheme, West stole various documents from a company's lockboxes, using keys he had acquired during previous employment as a courier with a different courier company.

At sentencing, the District Court added two points to appellant's base offense level, pursuant to section 3B1.3 of the Guidelines, for abusing a position of trust in a manner that significantly facilitated the commission and concealment of his crime. The District Court found that appellant was subject to the abuse-of-trust enhancement because he had been entrusted with large amounts of money, as well as information giving him access to large amounts of money. The court also found that the enhancement applied because West's position as president and sole employee of his own courier company facilitated the commission and concealment of his crimes. Because of this enhancement, appellant was sentenced to an additional six months imprisonment.

On appeal, West argues that the abuse-of-trust enhancement should not have been applied to him, because his job as a courier did not constitute a position of trust within the meaning of section 3B1.3 of the Guidelines. We agree. The commentary to section 3B1.3 defines a "position of trust" as one that is "characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, application note 1 (Nov. 1, 1994). Such positions, the commentary adds, involve "substantial discretionary judgment that is ordinarily given considerable deference." *Id.* However, appellant's position as a courier in this case involved almost no discretion whatsoever—his job consisted of nothing more than transporting certain items from one place to another. Such a position clearly does not involve the sort of discretion, either professional or managerial, contemplated by the plain language of the commentary to section 3B1.3. Accordingly, because the District Court erroneously applied the abuse-of-trust enhancement to appellant, we vacate this part of appellant's sentence and remand the case for resentencing without the enhancement.

## I. BACKGROUND

West was the president and sole employee of Courier Network USA ("CNUSA"), a small courier company that transported items for businesses in the Washington, D.C. area. West admitted engaging in two fraudulent schemes, one involving the theft of child-support checks he was hired to transport, the other involving false credit card transactions. The facts of these schemes are not in dispute.

### A. The Check Scheme

In 1992, West entered into a contract for CNUSA to transport child-support checks from a Signet Bank branch in Maryland to a NationsBank branch, also in Maryland.[1] The Maryland Office of Child Support Enforcement ("OCSE") had originally opened an account at Signet Bank to hold child-support funds sent by various parties to be distributed to the guardians of the children. The agency later moved its account to NationsBank. Because some individuals continued to send their checks to Signet Bank, West was hired to transport the errant checks to NationsBank.

In November 1992, West, using a false name, opened an account at a Citibank branch in the District of Columbia in the name of "Bureau of Support Enforcement, Client Collections." Over a period of several months, West deposited into this account $143,000 in child-support checks that he was supposed to deliver from Signet to NationsBank. West subsequently withdrew about $80,000 from this account. After discovering that the account was fraudulent, Citibank security officers contacted the United States Postal Inspector's Office, which investigated the matter. In July 1993, West and his attorney began discussing a pre-indictment plea with the United States Attorney's Office for the District of Columbia.

### B. The Credit Card Scheme

During these plea negotiations, West also engaged in a second fraudulent scheme.

---

1. It is unclear from the record whether the con-
tract was with Signet Bank or NationsBank.

Several years earlier, when working for a different courier company, West had obtained keys to certain lockboxes used by the Hecht Company to store documents awaiting pickup by a courier. In July 1993, West used these keys to remove from the lockboxes credit card receipts and other paperwork documenting credit card transactions, from which West compiled a list of valid Visa and MasterCard account numbers. Using these account numbers and a point-of-sales terminal West had installed in his home (also the office of CNUSA) in Northwest Washington, D.C., West processed over 1000 fraudulent credit card transactions, totaling $413,824.70. The transactions were credited to a merchant account West had opened for CNUSA in 1992 at First Premier Bank in Sioux Falls, South Dakota. When West asked First Premier to transfer these funds to his local account in Washington, officials at the bank became suspicious of the large number of transactions in what had been essentially a dormant account, and they contacted the FBI. West's credit card scheme was thus thwarted before any of the fraudulently acquired funds reached his Washington, D.C. account.

### C. The Plea and Sentencing

Pursuant to a plea agreement, West pleaded guilty on March 31, 1994 to an information charging him with one count of bank fraud in violation of 18 U.S.C. § 1344. The Government and West agreed that appellant would have an offense level of 15 and a criminal history category of I, yielding a projected range of 18–24 months imprisonment under the Guidelines. The presentence report agreed with this projection, but also recommended a two-point upward adjustment in West's offense level, under section 3B1.3 of the Guidelines, for abusing a position of private trust in a manner that significantly facilitated the commission and concealment of his offense. This adjustment raised the Guideline sentencing range to 24–30 months.

On June 21, 1994, the District Court, over West's objection, followed the recommendation of the presentence report and adjusted West's offense level upward under section 3B1.3. In imposing the abuse-of-trust enhancement, the District Court adopted the reasoning of the memorandum filed by the Government in support of the enhancement. *See* Sentencing Tr. (June 21, 1994) at 18, *reprinted in* Appendix ("App.") 83. The Government first argued that West occupied a position of trust because he had acted as an agent for both OCSE and the Hecht Company, and that these entities had entrusted him with either large amounts of money (the OCSE checks) or information which gave him access to large amounts of money (the credit card receipts in the Hecht lockboxes). *See* Government's Opposition to Defendant's Memorandum of Points and Authorities in Support of Defendant's Objections to the Presentencing Report at 4–6, *reprinted in* App. 60–62. The Government then contended that West's position as president and sole employee of CNUSA significantly facilitated the commission and concealment of his criminal activity. On this point, the Government contended that West's position as president allowed him to obtain the point-of-sales terminal and to open the merchant account at First Premier. And because West had no supervisor, he purportedly was able to avoid detection of both the check and credit card schemes. *See id.* at 6–7, *reprinted in* App. 62–63. The District Court sentenced West to 30 months imprisonment, to be followed by a three-year term of supervised release. The court also ordered West to pay restitution in the amount of $125,045.28 ($123,164.48 to OCSE and $1880.80 to First Premier Bank). West began serving his sentence in June 1994.

## II. ANALYSIS

■ West challenges the District Court's decision to increase his sentence by two levels because he abused a position of private trust under section 3B1.3 of the Guidelines. He claims that, under the commentary to section 3B1.3, as well as this court's construction of that section, he did not occupy a position of private trust with respect to either OCSE or Signet Bank (the check scheme) or the Hecht Company (the credit card scheme). Specifically, West contends that his sentence was improperly enhanced because his duties as a courier in connection

with his fraudulent schemes were not "characterized by professional or managerial discretion," as the commentary to section 3B1.3 states. Whether West abused a position of trust within the meaning of section 3B1.3 is a question of law that we review *de novo*. *United States v. Smaw*, 993 F.2d 902, 905 (D.C.Cir.1993) (*"Smaw I "*).

██ Section 3B1.3 of the Guidelines mandates a two-level upward adjustment of a defendant's base offense level "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (Nov. 1, 1994).[2] Thus, in determining the applicability of section 3B1.3, the court must decide (1) whether the defendant occupied a position of trust; and (2) whether the defendant abused that position in a manner that significantly facilitated the commission or concealment of the offense. *See, e.g., United States v. Brown*, 47 F.3d 198, 205 (7th Cir.1995). In this case, however, we do not reach the second inquiry regarding significant facilitation, because we conclude that appellant did not occupy a position of trust within the meaning of section 3B1.3.

The commentary to section 3B1.3, which was significantly amended on November 1, 1993, provides substantial guidance as to the meaning of a "position of trust":

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less

supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

Notwithstanding the preceding paragraph, because of the special nature of the United States mail an adjustment for an abuse of a position of trust will apply to any employee of the U.S. Postal Service who engages in the theft or destruction of undelivered United States mail.

*Id.*, application note 1 (Nov. 1, 1994).[3] The plain language of the commentary thus makes clear that positions of trust are those "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."

This explicit focus on professional or managerial discretion formed the basis for this court's decision in *United States v. Smaw*, 22 F.3d 330, 332 (D.C.Cir.1994) (*"Smaw II "*), the only case in which this circuit has considered section 3B1.3 in light of the amended

---

**2.** The full text of section 3B1.3 provides:

If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3.

**3.** Prior to the 1993 amendment, the commentary to section 3B1.3 provided no explanation of a "position of trust," stating only that

[t]he position of trust must have contributed in some substantial way to facilitating the crime and not merely have provided an opportunity that could as easily have been afforded to other persons. This adjustment, for example, would not apply to an embezzlement by an ordinary bank teller.

*Id.*, application note 1 (pre-Nov. 1, 1993).

commentary. In *Smaw II,* we held that a time and attendance clerk at the Federal Trade Commission ("FTC"), who obtained credit cards for fraudulent use by using the names and personal data (obtained through casual contacts as well as FTC documents) of fellow employees, did not occupy a position of trust within the meaning of section 3B1.3. *Id.* In ruling that the district court's enhancement of appellant's sentence was improper, we stated:

> The Sentencing Commission's commentary in application note 1 to § 3B1.3 defining the position of trust simply does not encompass appellant's job. If we include a time and attendance clerk within the scope of positions "characterized by professional or managerial discretion" the definition becomes so boundless as to be meaningless. The two-point enhancement is a significant aspect of sentencing. To expand its defining parameters to include [appellant's] position is to approach the danger perceived by the Ninth Circuit in *United States v. Cuff,* 999 F.2d 1396 (9th Cir.1993), of converting "the position of every person who handles property into one of trust." *Id.* at 1398.

*Id.* This court thus made clear that the commentary's focus on positions characterized by professional or managerial discretion places a significant limit on the types of positions subject to the abuse-of-trust enhancement.

In addition to the commentary's explicit language, all of the examples cited in the commentary suggest that section 3B1.3 focuses on positions with substantial professional or managerial discretion. The commentary states that the enhancement "would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3, application note 1. Each of these examples contemplates a "professional" or "manager" who, because of his or her special knowledge, expertise, or managerial authority, is trusted to exercise "substantial discretionary judgment that is ordinarily given considerable deference." *Id.*

Finally, the language in the commentary regarding Postal Service employees clearly indicates that the inclusion of those employees within the scope of section 3B1.3 is a special exception to the requirement of professional or managerial discretion, and that other positions comparable to an employee of the Postal Service (and not involving professional or managerial discretion) are not subject to the enhancement. As we stated in *Smaw II:*

> [T]he [Sentencing] Commission referred to the "special nature of the United States mail," and expressly concluded that a position-of-trust adjustment would "apply to any employee of the U.S. Postal Service who engages in the theft or destruction of undelivered United States mail." The Commission having clearly identified the United States mail as "special" and having introduced the provision with "[n]otwithstanding," the ancient maxim *"expressio unius est exclusio alterius"* applies with singular force. A Commission expressly thinking about the "special nature" of the mails and describing positions related thereto as ones of trust obviously did not intend to include positions that are in some view similar.

22 F.3d at 332–33 (citation omitted). Thus, the inclusion of Postal Service employees under section 3B1.3 in no way mitigates, but rather reinforces, the commentary's clear focus on positions "characterized by professional or managerial discretion." It is with this focus in mind that we now turn to the question whether the abuse-of-trust enhancement was properly applied in this case.

We conclude that West's duties as a courier did not involve substantial professional or managerial discretion, and thus that West did not occupy a position of trust within the meaning of section 3B1.3. In fact, the record before us indicates that West's position with respect to his criminal activities involved almost no discretion whatsoever. Appellant's duties with respect to the child-support checks were those of a simple courier—he was to pick up whatever checks had been mistakenly delivered to Signet Bank and

then to deliver those checks to the Nations-Bank branch where OCSE had established its new account. Likewise, with respect to the credit card scheme, West's sole function was to pick up certain documents from Hecht's lockboxes and deliver them to another designated location. The only conceivable discretion West had in performing these duties was in deciding which route to take as he drove from the pick-up location to the point of delivery—hardly the type of "*substantial discretionary judgment*" contemplated by the Sentencing Commission. This conclusion is buttressed by the fact that the duties of a courier like West closely resemble in nature those of a mail carrier for the Postal Service. And, as stated above, the commentary to section 3B1.3 makes clear that positions comparable to an employee of the Postal Service (and not involving professional or managerial discretion) are not subject to the abuse-of-trust enhancement.

The Government's theory in this case—that a simple courier should be subject to an abuse-of-trust enhancement under section 3B1.3 merely because he or she is entrusted with valuable things and has little or no supervision while performing his or her duties—would stretch the abuse-of-trust enhancement to cover endless numbers of jobs involving absolutely no professional or managerial discretion, in clear contravention of the plain language of the commentary to section 3B1.3. For example, under the Government's theory, nothing would prevent a trial judge from imposing the enhancement on hotel housekeepers. Surely, one who hires housekeepers to clean hotel rooms entrusts those persons with the valuable possessions of both the hotel and its guests, with virtually no supervision. But applying the abuse-of-trust enhancement to such persons would be utterly contrary to both the spirit and the letter of section 3B1.3. Indeed, the Government's theory would approach the danger that we noted in *Smaw II* "of converting the position of every person who handles property into one of trust." 22 F.3d at 332 (internal quotations omitted).

The Government finally argues that West occupied a position of trust because his position as president of his own courier company conferred upon him substantial managerial discretion in the performance of his duties for Signet Bank and NationsBank. However, we think West's title of president of CNUSA can carry no special weight in this case. First of all, West was entrusted with checks in his capacity as a simple courier, not in his capacity as president; and, as noted above, his work as a courier involved absolutely no professional or managerial discretion over the checks. Second, the Government offered no proof that the original contract between appellant and the bank may have suggested the existence of any real discretionary component to West's job. Simply put, on the record before the court, there is no evidence that appellant exercised any discretion, either professional or managerial, with respect to the task for which he had been hired by the bank. Accordingly, we conclude that the District Court improperly increased appellant's sentence under section 3B1.3 of the Guidelines.

## III. CONCLUSION

For the foregoing reasons, we vacate the two-point upward adjustment of appellant's sentence under section 3B1.3 of the Guidelines, and remand the case to the District Court for resentencing without the abuse-of-trust enhancement.

*So ordered.*

WALD, Circuit Judge, dissenting:

Section 3B1.3 of the Federal Sentencing Guidelines requires a two-level upward adjustment of a defendant's base offense level when "the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (Nov. 1, 1993). The § 3B1.3 inquiry is two-pronged: (1) whether the defendant occupied a "position of public or private trust"; and (2) whether abuse of that position facilitated the commission or concealment of the offense. Because I am convinced that both requirements are satisfied on the facts of this case, I would affirm the district court.

## A. The Nature of West's Position

The logical first step in deciding whether defendant Gary West occupied a "position of trust" lies simply in determining what position he held. It is at this early stage that I part ways with the majority's analysis. The majority repeatedly refers to West as a "simple courier," claiming that the "Government's theory in this case [is] that a simple courier should be subject to an abuse-of-trust enhancement under § 3B1.3 . . . ." *See* Majority Opinion ("Maj. op.") at 220.

The government has been crystal-clear throughout the course of West's prosecution, however, that the "position" it believes he "abused" within the meaning of § 3B1.3 was that of *"president* of his courier company," not that of "simple courier." *See, e.g.,* Appellee's Brief at 5, 6, 8 & 11 (emphasis added). The transcript of West's plea hearing establishes this fact with particular force. At the plea hearing, West requested to remain at liberty until the time of his sentencing hearing. *See* Transcript of Plea Hearing (Mar. 31, 1994) at 34–36, *reprinted in* Joint Appendix ("J.A.") at 42–45. He also asked to be permitted to continue working as a courier— for a company owned and managed by someone else—until that time. *Id.* at 45. The government saw no reason why West could not keep his job as a "simple courier"; government counsel stated that the "concern [was essentially with West operating a business and not working as a courier] . . . . [T]he unlawful acts that are the basis of this case relate to the defendant's operation and . . . ownership [of his courier business] . . . rather than acting as an employee." *Id.*

The question, then, is whether West's position as president and owner of his courier company was one of "trust" within the meaning of § 3B1.3. The commentary to § 3B1.3 provides limited guidance; it states that an individual in a position of trust is endowed with "professional or managerial discretion" and "subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature."

U.S.S.G. § 3B1.3, Application Note 1 (Nov. 1, 1993).

West certainly satisfies these minimal requirements. As president of his courier company, West was not "subject" to *any* "supervision" whatsoever.[1] Unlike a "simple courier," he was therefore free to misdirect items entrusted to him without fear of reprisals from above. West was, moreover, endowed with complete discretion in the selection and execution of contracts; again unlike the "simple courier," he was free to pick and choose among clients on the basis of their susceptibility to his connivances.

This straightforward application of the § 3B1.3 commentary to West creates no tension with our decision in *United States v. Smaw,* 22 F.3d 330 (D.C.Cir.1994) ("*Smaw II* "), upon which the majority relies. In *Smaw II,* we held that a secretary—a "time and attendance clerk"—in a federal agency did not occupy a position of trust because she lacked the requisite "professional or managerial discretion." *Id.* at 332. It is an unremarkable conclusion that a level GS–7 employee of the federal government—surely subject to close supervision—lacks "managerial discretion"; indeed, the court correctly observed that "to include Smaw's position [within the scope of § 3B1.3] is to approach the danger . . . of converting the position of every person who handles property into one of trust." *Id.* (internal quotation and citation omitted). On the other hand, to include within § 3B1.3 those individuals who—like West—both determine what "property" they will "handle" *and* then "handle" it entirely without supervision does not remotely "approach" this danger.

## B. Trust Relationship

West argues, however, that even if he did enjoy the "managerial discretion" and absence of supervision required by the commentary to § 3B1.3, those are necessary, but not sufficient, requirements for invoking the enhancement. Specifically, West argues that § 3B1.3 enhancements also require a "trust

---

1. The majority's hotel housekeeper hypothetical is, of course, clearly distinguishable from this case. West's situation is more analogous to that of a hotel manager who invites guests to keep their valuables in the hotel safe—thus making an implicit representation of trustworthiness—and then absconds with them.

relationship" between the defendant and his victim, relying on *United States v. Kosth,* 943 F.2d 798 (7th Cir.1991). *See* Appellant's Brief at 13–15.

Kosth was the owner of a credit reporting company that had a point-of-sale merchant account for processing credit card transactions. He submitted phony invoices for non-existent purchases using fraudulent credit cards. The court of appeals reversed the district court's imposition of a § 3B1.3 enhancement because there was "no special element of private trust involved in Kosth's relationship with the bank":

> [T]he relationship [here] ... was a standard commercial relationship. The fraud described [ ] does not differ from any other commercial credit transaction fraud.

*Id.* at 800.

This circuit has declined to adopt such a "trust relationship" rule in circumstances involving an abuse of "public trust." In *United States v. Shyllon,* 10 F.3d 1 (D.C.Cir.1993), we recently said that it is enough for a "public entity [to] place its trust in the defendant, and [for] the defendant to use that trust to harm a victim who may not trust the defendant at all." *Id.* at 5. Still, we observed that "[t]he requirement that the victim subjectively "trust" the defendant might make some sense when the enhancement is for abuse of private trust. We need not decide the question...." *Id.*

This case, however, does pose that question. I agree with West that we should require a "special element of trust" between the defendant and the victim before applying § 3B1.3 in the private trust context. The commentary's examples of positions that fall within § 3B1.3 provide support for this view; for example, an attorney serving as a guardian and a physician giving an examination make implicit or explicit representations to their victims that encourage reliance on their good faith. *See* U.S.S.G. § 3B1.3, Application Note 1 (Nov. 1, 1993).

*United States v. Boyle,* 10 F.3d 485 (7th Cir.1993), upon which the government relies, does not hold otherwise. Boyle was the president of an armored car company, who had contracts to store and deliver coin for the Federal Reserve Bank ("FRB") and the Illinois Tollway Authority. The court of appeals upheld Boyle's § 3B1.3 enhancement:

> Unlike Kosth, who was only an account holder at the bank he defrauded, Boyle was an agent of his victims, which entitled him to take possession of funds on their behalf.... It is difficult to imagine a position embodying more trust.

*Boyle* is thus consistent with a requirement of a "trust relationship" between a § 3B1.3 "private trust" defendant and his victim.

Accepting West's premise that a one-on-one "trust relationship" between a private actor and his victim must exist for a § 3B1.3 enhancement, however, I disagree with his conclusion that it is absent in his case. While West essentially claims to be more like Kosth than Boyle, I think the opposite is true. West—like Boyle—through implicit or explicit representations of trustworthiness induced clients to hire his courier company as their "agent." Signet entrusted West with valuables (checks), much as the FRB entrusted Boyle with its coin. I would therefore hold that West did occupy a position that potentially brought him within § 3B1.3, even though I agree with him that both lack of oversight and the existence of a trust relationship are necessary elements of such an enhancement.

## C. *Facilitation*

West occupied a "position of trust" as president of his courier company; the remaining question is simply whether he "abused" that position in a way that "facilitated the commission or concealment of [his] offense[s]," the second prong of the § 3B1.3 analysis. Although the majority purports not to reach this question, *see* Maj. op. at 219, the final full paragraph of the opinion appears to hold that West's position as president did not facilitate his crime because he "was entrusted with checks in his capacity as a simple courier, not in his capacity as president." *Id.* at 221.

The question, however, is not which hat West was wearing when he actually purloined the checks at issue, but rather whether the fact that he sometimes wore the "presidential" cap "facilitated the commission or

concealment of his offense[s]." I believe it did. As the government stated at West's plea hearing, the entire "basis of this case relate[s] to the defendant's operation and ... ownership [of his courier business] ... rather than acting as an employee." *See* Transcript of Plea Hearing (Mar. 31, 1994) at 34–36, *reprinted in* J.A. at 42–45. In other words, it was in West's capacity as president of his company that he "was solely responsible for the negotiation [ ] performance" of the contract with Signet, which allowed him access to the checks in the first place. Appellee's Brief at 11. Therefore, West's position as president of his company surely "facilitated" the commission of his crimes.

## CONCLUSION

While the realm of "positions of trust" under the Guidelines may be unsettled at the frontier, I believe that the circumstances of this case take us well into the heartland. West's position as president of his courier company was one of "trust" within the meaning of § 3B1.3, and it "facilitated" the commission of his offenses. I would affirm the district court's application of the "abuse-of-trust" enhancement to West.