UNITED STATES of America

v.

Martin MILLER, Defendant.

Crim. A. No. 94–0419 (PLF).

United States District Court,
District of Columbia.

Sept. 15, 1995.

Virginia Cheatham, Assistant United States Attorney, Washington, DC, for plaintiff.

Teresa Alva, Assistant Federal Public Defender, Washington, DC, for defendant.

## OPINION

PAUL L. FRIEDMAN, District Judge.

This case came before the Court on August 21, 1995, for an evidentiary hearing to determine the application of the United States Sentencing Guidelines in the sentencing of Martin Miller.

## I. BACKGROUND

Martin Miller is a real estate developer and managing partner of several District of Columbia real estate ventures. Beginning in 1986, Mr. Miller entered into a series of partnership agreements with several other individuals to create five real estate partnerships: 2414 Douglas Street Ltd., 2221 Adams Place Associates, 5th Street Venture, 2215 5th Street Association ("Intown"), and Lamont Street Associates. In his capacity as managing partner of these five ventures, from 1990 through 1993 Mr. Miller transferred monies without authorization from these "victim" partnerships to other unrelated partnerships in which he had an interest. He also caused checks to be written from victim partnership bank accounts to himself personally and to his company, Martin Miller Properties, Inc. ("MMP"). He also failed to pay property taxes on several of the properties while representing to the other partners that taxes had been paid. Mr. Miller pled guilty to one count of wire fraud in violation of 18 U.S.C. § 1343 for faxing a falsified bank statement which he used to deceive the other partners about the financial condition of the victim partnerships.

For three days, from August 21 to August 23, 1995, this Court held an evidentiary hearing to resolve two disputed issues raised by the applicable sentencing guidelines, to wit, the amount of loss to the victim partnerships attributable to Mr. Miller's actions, U.S.S.G. § 2F1.1(b)(1), and whether Mr. Miller abused a position of trust. U.S.S.G. § 3B1.3.

The Presentence Investigation Report prepared by the United States Probation Office calculated the following under the Sentencing Guidelines: a base offense level for fraud of six; an amount of loss of $388,688 which increases the offense level by nine; a two-level enhancement for more than minimal planning; a two-level enhancement for abuse of a position of trust; and a three-level reduction for acceptance of responsibility, for a total offense level of 16.[1] See U.S.S.G §§ 2F1.1, 3B1.3, 3E1.1 The government subsequently submitted an amount of loss of $358,952 which also carries a 9–level enhancement.

Defendant does not contest the base offense level of six nor the increase of two levels for more than minimal planning. On the remaining disputed issues, defendant of-

---

1. If the total sentencing level is less than 16, acceptance of responsibility decreases the offense level by two. If the total level is 16 or greater, the reduction is three levels. U.S.S.G. § 3E1.1.

fered competing evidence on the amount of loss which it calculates at $173,017, and submitted legal argument on the abuse of trust issue. Pursuant to the plea agreement, the government takes no position on the abuse of trust issue.

During the hearing, the government called as witnesses FBI Special Agent David Riser and, on rebuttal, Armond Spikell, a general partner in all five victim partnerships. The defense called Martin Miller and Herbert Ritter, a former employee of Martin Miller Properties. Mr. Ritter is currently employed by Meredith Olson who is a general partner in the victim partnerships. Defendant also called Richard Champion, a certified public accountant and expert witness.

The hearing focused on the amount of loss and the underlying issues of contractual interpretation. The parties agreed that Mr. Miller was entitled to a management fee of three percent of collected rents from each of the victim partnerships except Lamont Street; they disagreed as to whether he was entitled to expenses beyond that. Defendant conceded that he transferred monies and that checks were written to him personally and to his company without authority, and there was no dispute over the total amount that Mr. Miller took. Tr. at 6. Defendant contended, however, that the written partnership agreements authorized the reimbursement of his and his company's expenses, including overhead, in managing the partnerships and that these expenses should be deducted from the total amount of loss. The government countered that while the partnership agreements provide for the reimbursement of out-of-pocket expenses, these were not intended to include many of the overhead items claimed by Mr. Miller. It argued that the money he took or was owed for those costs properly belongs in the total amount of loss.

The parties offered in evidence the partnership agreements, a letter sent by Mr. Miller, partnership expense statements prepared by Mr. Miller's office and cancelled checks. There was testimony about these documents and about a meeting of the partners at which expenses were discussed.

## II. AMOUNT OF LOSS

### A. *The Partnership Agreements*

On their face, all five partnership agreements permit the general partners to be reimbursed for expenses. Each agreement contains the following provisions:

10.3 [T]he General Partners shall have the following powers on behalf of the partnership ...

(h) To employ any one or more persons ... to manage Partnership property, and in all such events to pay reasonable compensation for such services.

(o) To make any and all expenditures which the General Partners, in its [sic] sole discretion, shall deem necessary or appropriate in connection with the management of the affairs of the Partnership ... including, without limitation, all legal, accounting and other related expenses incurred in the connection with the organization and financing of the Partnership.

11.3 The General Partners shall be entitled to reimbursement for out-of-pocket expenses incurred in connection with the formation and activities of the Partnership upon demand therefor.

*See e.g.,* Agreement of Limited Partnership of The Fifth Street Venture, Def.Ex. 1.

None of the agreements contains any reference to Mr. Miller's three percent management fee, although several agreements provide for a construction and development fee to be given to the Managing Partner. All parties agree, however, that Mr. Miller was entitled to a three percent management fee for all properties except Lamont Street.[2] The agreements contain no definition of "expenses" or of "compensation" beyond "reasonable."

---

2. The Lamont Street agreement contains the same provisions as the other four agreements. Def.Ex. 3. None of the parties dispute, however, that this arrangement was understood to be different: Mr. Miller was entitled to his expenses for managing that property and he was not entitled to a three percent management fee. Tr. at 150. There is no dispute over the monies Mr. Miller took from Lamont Street; the government concedes that he was entitled to them.

Special Agent Riser testified that the partners believed that Mr. Miller was never entitled to anything beyond the three percent fee. Mr. Spikell also testified that, at least after a meeting held in 1989, the partners believed that Mr. Miller was not entitled to overhead expenses. Mr. Spikell also testified that "out-of-pocket expenses" referred to such items as Federal Express packages sent on behalf of the partnerships out of Mr. Miller's office but not to items such as rent, phones, salaries, car rentals, or other overhead. *See also* Tr. at 35. Mr. Miller asserts that he was entitled to these kinds of overhead expenses, including Mr. Ritter's salary, for work done on behalf of the partnerships. Tr. at 196.

Richard Champion, defendant's accounting expert, testified that three percent was a normal base management fee in the real estate development community, and that it would be expected that such a three percent fee would be in addition to expenses.[3] Tr. at 247–49. He also testified that if Mr. Miller had been limited to three percent he would have gone bankrupt. Tr. at 252. Mr. Miller testified that he considered the three percent to be his "profit" and payment for his expertise, that he could not possibly have run Martin Miller Properties on a three percent fee alone and that he therefore never would have agreed to such an arrangement without expenses. Tr. at 149.

## B. *The Meeting*

In either 1989 or 1990, a meeting occurred between Mr. Miller and the three other general partners of the five partnerships: Armond Spikell, Meredith Olson, and David Lawson. Mr. Spikell testified that he was sure that the meeting occurred in 1989. Mr. Miller testified that he believed the meeting occurred in 1990, having been triggered by a cash call letter he sent to the other partners on May 20, 1990. Tr. at 167. There was also conflicting evidence as to what was said at the meeting. Mr. Spikell testified that during this meeting the partners expressed dis-

satisfaction with Mr. Miller's management and stated to Mr. Miller that he was not entitled to his overhead as part of expenses. *See also* Tr. at 58 (testimony of Special Agent Riser). Mr. Spikell conceded, however, that prior to the meeting the partners were aware that Mr. Miller had been taking reimbursements for overhead items, although the partners were not aware of the extent or the amounts of the reimbursements. Mr. Miller testified that at this meeting the partners told him to keep the expenses down, but that no one told him that he was not entitled to them. Tr. at 168.

■ The meeting is of limited evidentiary significance. Regardless of when the meeting occurred or what was said, all five written partnership agreements require that any modifications to them be in writing. *See e.g.,* Agreement of Limited Partnership of The Fifth Street Venture §§ 20.1, 23.6, Def.Ex. 1. Insofar as the partners thought they were changing the terms of Mr. Miller's management at the meeting they legally failed to do so. If Mr. Miller was originally entitled to expenses under the agreements, the meeting could not effect a modification since it produced no writing.

■ The meeting is illustrative, however, of the parties' understandings of the original agreements. *See UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469, 473 (D.C.Cir.1993) (in divining the meaning of contract terms the Court is not bound by the four corners of the agreement but may consider extrinsic evidence). Although Mr. Spikell asserts that Mr. Miller was never entitled to overhead expenses, when asked whether Mr. Miller ever charged the partnerships for administrative expenses, he stated: "We started that way." Since the meeting took place at least three years after the formation of the first partnership, Mr. Spikell's testimony in this regard indicates that Mr. Miller was following the terms of the original agreement by taking overhead expenses.

---

3. Defendant argued that the fact that Meredith Olson who took over the management of the property took a six percent management fee as well as expenses demonstrates that three percent without expenses is unreasonably low. Income Statement Prepared By Meredith Olson, Defense

Ex. 13. Mr. Spikell testified, however, that Ms. Olson took over the management at a time when the partnerships were in substantial disarray due to Mr. Miller's activities, and that her higher fee reflected her extraordinary duties.

### C. *Miller Letter of May 20, 1990*

On May 20, 1990, Mr. Miller sent a cash call letter to the partners stating that the Douglas Street partnership needed a capital infusion. Def.Ex. 12. The letter included an itemization of "out-of-pocket" expenses totalling $30,629 that Mr. Miller had incurred from 1987 to 1990 in connection with the construction and development of the property for which he had not yet been reimbursed. The letter also contained a description of services that Mr. Miller and Martin Miller Properties were providing or had provided to the partnership. Over the course of the next three years, Mr. Miller apparently reimbursed himself for most of these expenses by writing checks to himself or to MMP from partnership bank accounts. Tr. at 171 (Miller testimony). At the hearing, defendant argued that these expenses were legitimately incurred and should be subtracted from the amount of loss.

■ The letter is strong evidence that the partnership agreements were understood by the partners to include overhead expenses as part of Mr. Miller's out-of-pocket expenses. According to Mr. Spikell's testimony, the letter was sent after the meeting at which expenses were discussed. Yet the partners did not respond to the letter or otherwise indicate that it contradicted their understanding. While Mr. Spikell asserts that he understood the letter's itemization of services to be mere puffery, the Court is convinced that Mr. Miller intended the letter to reflect his actual activities and expenses incurred thereby and that the partners were put on notice of his intent to take reimbursement for them. Mr. Miller therefore is entitled to these expenses for Douglas Street Associates.

In light of the plain language of the partnership agreements, the meeting and the May 20, 1990 letter, the Court finds that Mr. Miller was contractually entitled to reimbursement for overhead expenses in the management of the five victim partnerships. While the term "out-of-pocket expenses" may admit of some ambiguity, the surrounding circumstances establish that the partners and Mr. Miller intended expenses to include the overhead expenses needed to operate Mr. Miller's business on behalf of the partnerships. *See Carey Canada, Inc. v. California Union Ins. Co.*, 708 F.Supp. 1, 4 (D.D.C. 1989) ("It is well settled that whether a contract term is ambiguous is a question to be determined by the trial judge.").

### D. *Legitimate and Illegitimate Expenses*

Defendant has provided the Court with several figures representing Mr. Miller's allegedly legitimate expenses: $95,727 representing administrative expenses based on partnership tax returns; $30,629 representing uncollected expenses from Douglas Street Associates as reflected in the May 20, 1990 letter; and $59,579 in construction costs associated with Fifth Street Ventures which, because they were construction costs and not expenses for tax purposes, were not accounted for on partnership tax returns.

Although Mr. Miller was entitled to his expenses for running the properties, not all expenses are necessarily deductible from the amount of loss. Insofar as these expenses are attributable to overhead incurred by Mr. Miller's work for non-victim partnerships, they should not be subtracted from the amount of loss. In addition, any monies taken for personal or other illegitimate purposes, not related to the operation of the victim partnerships, should not be deducted from the amount of loss.

■ It is not entirely clear from the evidence presented to the Court which individual expense items or checks written were legitimate and which were illegitimate. It is further unclear what percentage of Mr. Miller's and Martin Miller Properties' time was spent on behalf of the five victim partnerships. *See* Tr. at 111. The amount of loss issue, however, is an enhancement of the base offense level, and as such the government bears the burden of proving the enhancement by a preponderance of the evidence. *United States v. Salmon*, 948 F.2d 776, 778–79 (D.C.Cir.1991). Furthermore, the Court need not determine with precision the amount of loss but only make a reasonable estimate given the available information. U.S.S.G. § 2F1.1, comment. (n. 8).

With respect to the expenses identified in the May 20, 1990 letter, by defendant's own

testimony it appears that Mr. Miller reimbursed himself for at least some of these expenses and that those reimbursements would have been included in the Douglas Street tax returns for the years 1990–1993. Tr. at 171. The defendant's proffered estimation of $95,727 for Mr. Miller's expenses is also based on the partnership tax returns. As a result, some of the $30,629 to which Mr. Miller is entitled may already be accounted for by the $95,727 figure. Mr. Miller was unable to testify as to precisely how much of that amount he collected from the partnerships, however, and the government has presented no evidence on this point. Since the government has not met its burden on this issue, the Court will deduct some portion of the $30,629 amount from the total amount of loss.

Although Mr. Miller emphatically should not be permitted to use money taken for personal expenses, or expenses incurred on other projects, or double count expenses in order to reduce his sentence, the defense has provided sufficient information to establish that significant legitimate expenses were incurred. The government has not met its burden of showing that individual expense reimbursement checks written to Mr. Miller and to Martin Miller Properties were illegitimate, or that some determinate percentage of Mr. Miller's and MMP's time was spent on other projects, or that Mr. Miller is not entitled to the construction costs identified by defendant. Therefore, absent such a showing by the government, the Court accepts the evidence and representations presented by the defendant.

■ In sum, Mr. Miller is entitled to deduct from the amount of loss his overhead and administrative expenses ($95,727), some portion of the uncollected expenses from Douglas Street Associates itemized in the May 20, 1990 letter ($30,629), and construction costs incurred from Fifth Street Ventures ($59,579), for a maximum total of $185,935. The minimum total amount of loss would thus be $173,017 ($358,952 minus $185,935). The Court therefore finds that the amount of loss is between $173,017 and $200,000. Correspondingly, Mr. Miller's base offense level is enhanced by seven levels, not nine levels. U.S.S.G § 2F1.1(b)(1)(H).

### III. ABUSE OF TRUST

Defendant offers two arguments against the imposition of a two-level enhancement for abuse of trust under U.S.S.G. § 3B1.3. First he argues that since his sentence is already being enhanced for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2), the imposition of an abuse of trust enhancement would penalize him twice for the same conduct. Defendant seeks to distinguish his case from *United States v. Gottfried*, 58 F.3d 648 (D.C.Cir.1995), in which the D.C. Circuit imposed both abuse of trust and more than minimal planning enhancements.

■ The Court reads *Gottfried* to permit the imposition of both enhancements in this case. In *Gottfried*, the court reasoned that the underlying conduct—multiple instances of document destruction and abuse of public trust—were distinct and did not necessarily follow from one another. The court wrote:

> It does not follow that because an individual holds a position of trust, he necessarily must engage in more than minimal planning when he ... willfully remov[es] or destroy[s] documents filed in a public office. If Gottfried, in a fit of frustration over his workload, had burned one of the case files assigned to him, the minimal planning enhancement doubtless would not have applied. And a person does not necessarily have to hold a position of trust to violate 18 U.S.C. § 2071 with more than minimal planning. If the night janitor systematically tampered with case files ... he would deserve a planning enhancement but not an additional boost for abusing the sort of position Gottfried held.

*Id.,* at 653. The same logic applies in the case at bar. If Mr. Miller, in a fit of insecurity, had faxed a hurriedly altered bank statement to only one partner, the more than minimal planning enhancement might not have applied. Similarly, as defense counsel argued in open court, even if Mr. Ritter, who was the office bookkeeper and an employee of Mr. Miller's, had repeatedly faxed forged bank statements, he still would not be abus-

ing the sort of position of trust held by Mr. Miller. The two enhancements address different aspects of Mr. Miller's conduct and thus do not constitute double counting.

Defendant also contends that Mr. Miller did not occupy the sort of position of trust covered by § 3B1.3 and that, even if he did, he did not abuse that position of trust "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Defendant argues that he "wore two hats": one as a co-equal partner which carried with it a fiduciary duty to other partners, and one as manager which did not carry a similar duty, and that he engaged in the charged conduct while wearing the second hat. Defendant claims that there was no significant nexus between Mr. Miller's position of trust and the conduct for which he is charged.

The D.C. Circuit addressed the abuse of trust issue in *United States v. West,* 56 F.3d 216 (D.C.Cir.1995), and in *United States v. Smaw,* 22 F.3d 330 (D.C.Cir.1994). In both cases the court declined to apply the abuse of trust enhancement because the nature of the defendants' activities was non-managerial or non-discretionary. In *Smaw,* the court noted that to "include a time and attendance clerk within the scope of positions 'characterized by professional or managerial discretion' the definition becomes so boundless as to be meaningless." *United States v. Smaw,* 22 F.3d at 332. (citations omitted). In *West,* the court concluded that defendant's "duties as a courier did not involve substantial professional or managerial discretion" notwithstanding the fact that the defendant was also the president of the courier company. *United States v. West,* 56 F.3d at 220.

The Court finds that, unlike the defendants in *West* and *Smaw,* Mr. Miller occupied a position of professional and managerial discretion and that the nexus between his position and his illegal conduct was sufficiently significant to warrant the enhancement. As an initial matter, the partnership agreements contain almost no restrictions on Mr. Miller's discretion. They state in part:

10.2 The Managing General Partner shall be responsible for the day to day man-agement of the Partnership and shall have such duties and responsibilities as may be assigned to him from time to time by the General Partners.

Indeed, as defense counsel has emphasized, Tr. at 10, Mr. Miller was far more than a mere manager; he was a full partner with an equity stake in the ventures and it was in this capacity that the other partners entrusted him with the partnership's affairs. *See, e.g., United States v. West,* 56 F.3d at 222 (Wald, J., dissenting) (arguing that defendant abused his position of trust not as a simple courier but as president of a courier company).

As a practical matter, Mr. Miller ran all partnership operations, he wrote checks from partnership accounts and he made discretionary decisions regarding development and construction, all in his capacity as managing partner. While the other partners had the right to inspect bank statements and other partnership records, these records were apparently kept in Mr. Miller's office and the partners relied almost exclusively on Mr. Miller's representations about the financial state of the partnerships. While it is true that the mere faxing of an altered bank statement could have been accomplished by someone who did not hold a position of trust, the partners' reliance on the faxed statement from Mr. Miller, the ensuing deception, and many of the other events charged in the original indictment also contribute to the abuse. *See* U.S.S.G. § 1B1.3 & comment. (n. 1 & 6) (court may consider relevant conduct not charged in determining adjustments). The Court therefore finds that Mr. Miller abused a position of trust pursuant to U.S.S.G. § 3B1.3.

## IV. CONCLUSION

Mr. Miller's base level offense for fraud is six. The amount of loss is between $173,017 and $200,000 which enhances his sentence by seven levels. He engaged in more than minimal planning which adds two levels, and he abused a position of trust which adds another two levels, for a total of 17. He has accepted responsibility for his conduct which reduces his total by three levels for a final total of 14.

As he has a Criminal History Category of I, the sentencing range is 15–21 months.

SO ORDERED.