99 F.3d 448
 321 U.S.App.D.C. 309
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America, Appellee,
v.
Martin MILLER, Appellant.
 No. 95-3190.
 United States Court of Appeals, District of Columbia Circuit.
 Sept. 23, 1996.
 
 Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs filed by the parties. The Court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.Rule 36(c). For the reasons stated in the accompanying Memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED by the Court that the order of the District Court is affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely-filed petition for rehearing. See D.C.Cir.Rule 41(a).
 
 ATTACHMENT
 MEMORANDUM
 
 4
 Martin Miller ("Miller") appeals from his sentence enhancement, pursuant to section 3B1.3 of the U.S. Sentencing Guidelines, for abuse of a position of trust. On December 9, 1994, Miller pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. The district court held a three-day evidentiary hearing, commencing on August 21, 1995, to determine the amount of loss involved in the offense and whether appellant abused a position of trust. On September 15, 1995, the district court issued an opinion finding that the amount of loss was between $173,017 and $200,000, which Miller does not challenge here. United States v. Miller, 901 F.Supp. 371, 376 (D.D.C.1995). The court also found that Miller had abused a position of trust, and increased Miller's sentence by two levels as a result. Id. at 377-78. On November 28, 1995, the district court sentenced Miller to fifteen months' imprisonment, to be followed by three years of supervised release, ordered restitution in the amount of $173,000 and imposed a special assessment of $50. We affirm the district court's decision to enhance Miller's sentence for abuse of a position of trust.
 
 
 5
 At the evidentiary hearing, the government called two witnesses: FBI Special Agent David Riser ("Riser") and, on rebuttal, Armond Spikell ("Spikell"), a general partner in all five victim partnerships. Miller testified in his own defense, as did Herbert Ritter ("Ritter"), a former employee of Martin Miller Properties, Inc. ("MMP"), and Richard Champion, a certified public accountant. The undisputed facts, as related by the district court, are as follows:
 
 
 6
 Martin Miller is a real estate developer and managing partner of several District of Columbia real estate ventures. Beginning in 1986, Mr. Miller entered into a series of partnership agreements with several other individuals to create five real estate partnerships: 2414 Douglas Street Ltd., 2221 Adams Place Associates, 5th Street Venture, 2215 5th Street Association ("Intown"), and Lamont Street Associates. In his capacity as managing partner of these five ventures, from 1990 through 1993 Mr. Miller transferred monies without authorization from these "victim" partnerships to other unrelated partnerships in which he had an interest. He also caused checks to be written from victim partnership bank accounts to himself personally and to his company, Martin Miller Properties, Inc..... He also failed to pay property taxes on several of the properties while representing to the other partners that taxes had been paid.
 
 
 7
 Id. at 372.
 
 
 8
 The partnership agreements and the witnesses' testimony provided evidence on Miller's powers and responsibilities as Managing General Partner. The language for all of the agreements other than the Lamont Street Associates agreement was identical, and stated that "[t]he Managing General Partner shall be responsible for the day to day management of the Partnership and shall have such duties and responsibilities as may be assigned to him from time to time by the General Partners." The agreements also provided that "[t]he books of account of the Partnership ... shall be kept by or under the supervision of the Managing General Partner and the same shall be lodged in the custody of the Managing General Partner" and that "[t]he Managing General Partner shall cause Partnership [Tax] Returns to be timely filed on behalf of the Partnership." The agreements also stated that "[t]he General Partners shall manage, control, administer and operate the business and affairs of the partnership, in their sole discretion" and that all withdrawals from partnership accounts would require the signatures of at least two partners. The approval of three of the four general partners was needed in order to require additional capital contributions, adopt a development plan, to borrow money or refinance loans, or to lease or sell any substantial part of the partnership property. Appellant's App. at 20-27; see also Appellant's App. at 28-35 (Lamont Street Associates agreement containing slight variations in language).
 
 
 9
 Riser testified that Miller "maintained the books and records. Collected the rents on the partnerships. Made the payments, just normal payments ... and then reported through financial statements ... to the partners." Tr. 25. The payments that Miller was responsible for making were to cover various operating expenses, such as mortgage and utility payments and property taxes. Tr. 26. Riser further testified that Miller had authority to transfer money among the four partnerships other than Lamont Street Associates, but not between these four partnerships and Lamont Street Associates or any other partnerships. Tr. 68-69. According to Ritter and Riser, the checkbooks for the partnerships' bank accounts were kept in Miller's office and Riser stated that some checks were issued with Miller's signature alone. Tr. 26, 33-34, 262-63. The financial records that Miller prepared took the form of income and expense statements and balance sheets. These statements were provided to the other partners and to the tax accountant who prepared the partnerships' tax returns. Tr. 42-43.[1] The process of constructing the income and expense statements appears to have changed over time. Initially, MMP employees, including Ritter, would generate the statements by using a computer program. In order for the program to work, payments made on the partnership accounts had to be coded to indicate the category of expense the payment reflected. Miller would tell the employees generating the statements how to code any checks about which they had questions, including the checks made out to himself or MMP. Tr. 205-06. Riser and Ritter testified that after problems developed with the computer in 1992, Miller would handwrite the income and expense statements and balance sheets and Ritter would type up the statements. Miller, on the other hand, maintained that Ritter compiled the statements from check stubs and that Miller only gave Ritter some of the numbers for the statements. Tr. 43, 206-07, 260-62. The record indicates that the income and expense statements that Miller provided to the other general partners were not accurate: some of the income received by the partnerships and some of the checks written on partnership accounts were not reported, and the statements listed the property taxes as having been paid. Tr. 49-52, 261-62, 267, 280. Miller admitted that some of the information on the income and expense statements was false and that he had also concealed his theft by altering a bank statement, tax returns and other financial records. Tr. 213-14, 219, 223. Finally, the record also establishes that Miller was given responsibility for development and construction of partnership properties and that he was the only partner with substantial experience in this area. Tr. 134-35, 140-41.
 
 
 10
 Under section 3B1.3 of the U.S. Sentencing Guidelines, a defendant's sentence is to be increased by two levels "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." A court undertakes a two-part inquiry in determining whether section 3B1.3 is applicable; "the court must decide (1) whether the defendant occupied a position of trust; and (2) whether the defendant abused that position in a manner that significantly facilitated the commission or concealment of the offense." United States v. West, 56 F.3d 216, 219 (D.C.Cir.1995). It would appear that we should give due deference on appeal to a district court's determination that sentence enhancement under section 3B1.3 is warranted. Such a determination turns on the district court's application of the Guidelines to a specific factual context, namely the details of the defendant's powers and responsibilities, which "will typically not be exactly replicated in any other case," and therefore we grant due deference to the district court's application of the law (the Guidelines) to the facts. United States v. Kim, 23 F.3d 513, 517 (D.C.Cir.1995); United States v. Broumas, 69 F.3d 1178, 1180-81 (D.C.Cir.1995), cert. denied, 116 S.Ct. 1447 (1996). (Although in other cases involving only the meaning of the Guidelines we reviewed the district court's interpretation of section 3B1.3 de novo. See West, 56 F.3d at 219; United States v. Smaw, 993 F.2d 902, 905 (D.C.Cir.1993)).
 
 
 11
 Miller argues that the district court erred in applying section 3B1.3 to him because his position as Managing General Partner was not a position of trust as envisioned by the Guidelines. The commentary on section 3B1.3 in the Sentencing Guidelines describes the section as applying to positions "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." Application Note 1, U.S.S.G. § 3B1.3. Miller argues that under the partnership agreements he had no discretionary authority and thus did not occupy a position of trust. In particular, Miller notes that he had to obtain the signature of at least one other general partner before he could issue a check and that most of his responsibilities, such as paying bills that became due and depositing payments received in the partnership accounts, were ministerial or clerical in nature. While Miller acknowledges that he did exercise substantial discretion in regard to development and construction, he maintains that his discretion in this area is irrelevant because it did not contribute to the commission or concealment of his crime.
 
 
 12
 We do not find Miller's argument convincing. It is apparent from the record that the other general partners did entrust Miller with discretionary authority over the financial affairs of the partnerships, notwithstanding his inability to write checks or undertake loans on his own. Under the language of the agreements, Miller was responsible for the day-to-day management of the partnerships and the district court found that "[a]s a practical matter, Mr. Miller ran all partnership decisions." Miller, 901 F.Supp. at 377. Even Miller's counsel acknowledged that "it was Miller who was essentially running the activities at the partnerships as the managing partner." Tr. 11. Miller was given custody of the partnerships' checkbooks and responsibility for depositing payments to the partnership, making necessary payments and compiling the income and expense reports. In compiling these reports, Miller had control over what income and expenses were included and how different expenses that were included were classified. These factors make this case similar to United States v. Valenti, 60 F.3d 941 (2d Cir.1995), where the sentence received by a treasurer of an apartment owners' organization who embezzled the organization's funds was enhanced under section 3B1.3. In finding that the treasurer occupied a position of trust, the Second Circuit stressed not only that the treasurer could write checks on his own signature up to $1,000, but also that the treasurer "was responsible for the financial records" and "had sole possession of the checkbook." Id. at 947; see also United States v. Allison, 59 F.3d 43, 46 (6th Cir.), cert. denied, 116 S.Ct. 548 (1995) (noting that a position of trust would exist where a defendant was the last person to handle checks after they were signed, the first to review canceled checks returned by the bank, and the person responsible for reconciling the checking account).
 
 
 13
 It is also significant that Miller operated essentially without supervision. Although the partnership agreements gave the other general partners access to the financial records, in practice they saw only the checks for which Miller wanted a co-signature and the income and expense reports that Miller generated. As the district court found, "the partners relied almost exclusively on Mr. Miller's representations about the financial state of the partnerships." Miller, 901 F.Supp. at 377. The commentary in the Sentencing Guidelines makes clear that the degree to which a defendant is supervised is relevant to determining whether the defendant occupied a position of trust and not only, as Miller claims, whether this position assisted in a defendant's commission or concealment of the crime. Application Note 1, U.S.S.G. § 3B1.3 ("[p]ersons holding such positions [of trust] ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary"); see also United States v. Ragland, 72 F.3d 500, 503 (6th Cir.1996) (distinction between fiduciary, who occupies position of trust, and bank teller, who does not, involves in part "lesser degree of direct supervision exercised over fiduciar[y] ... and hence greater difficulty in detecting [a fiduciary's] transgressions"). The partners' reliance on Miller is also relevant because it demonstrates that they viewed him as occupying a position of trust, and whether or not a defendant occupies a position of trust should be determined from the perspective of the victims of the defendant's crime. United States v. Gordon, 61 F.3d 263, 269 (4th Cir.1995); United States v. Castagnet, 936 F.2d 57, 62 (2d Cir.1991).
 
 
 14
 We also disagree with Miller's claim that his job title and the discretionary authority he exercised over development and construction are irrelevant in determining whether he occupied a position of trust. In West, we refused to accord any special weight to the fact that the defendant was president of a courier company because there was no evidence that the defendant exercised discretionary authority and the defendant "was entrusted with the checks in his capacity as a simple courier," not as president. 56 F.3d at 257. Here, however, there is evidence of Miller's discretionary authority and Miller was entrusted with the checkbooks and financial records precisely because he was the Managing General Partner. Thus his title is relevant to our analysis. Our decision in Broumas indicates that a defendant's offense need not be connected to the discretionary aspects of the defendant's position for section 3B1.3 to apply. In Broumas we held that the defendant, who was chairman of the board of a bank, "unquestionably held a position of trust," even though the offense that Broumas committed did not involve abusing the managerial discretion he had as chairman but rather abusing a personal check credit privilege that he was given because of his position. 69 F.3d at 1181. Instead, we considered the relationship between the defendant's position and his offense in determining whether he abused the position of trust that he occupied. Id. Similarly, it is not necessary that Miller's offense be connected to his discretionary authority over development and construction in order for him to be found to occupy a position of trust, although the presence or absence of such a connection is relevant to deciding whether Miller abused his position.
 
 
 15
 We also find that the record clearly demonstrates that Miller abused his position of trust in a manner that significantly facilitated the commission or concealment of his offense. Miller abused his custody of the checkbooks to write unauthorized checks to himself and MMP and to transfer partnership monies to unrelated partnerships. He also took advantage of his responsibility for collecting rent to divert payments to the partnerships to his own account. He was able to falsify financial records and cover up his misappropriation of partnership funds as a result of his control of the income and expense statements and tax returns.
 
 
 16
 For the foregoing reasons, we affirm the district court's decision to enhance Miller's sentence for abuse of a position of trust.
 
 
 
 [1]
 It is unclear from the record whether Miller prepared a second version of the statements for the tax accountant. See, e.g., Tr. 220-24